*This opinion is subject to revision before*
*publication in the Pacific Reporter*

**2015 UT 19**

IN THE

## SUPREME COURT OF THE STATE OF UTAH

STATE OF UTAH,
*Appellee,*

*v.*

MICHAEL JONES,
*Appellant.*

No. 20100555
Filed January 30, 2015

Third District, Salt Lake
The Honorable Michele M. Christiansen
No. 071900185

Attorneys:

Sean D. Reyes, Att'y Gen., John J. Nielsen, Asst. Att'y Gen.,
Salt Lake City, for appellee

Lori J. Seppi, Salt Lake City, for appellant

ASSOCIATE CHIEF JUSTICE NEHRING authored the opinion
of the Court, in which CHIEF JUSTICE DURRANT, JUSTICE DURHAM,
JUSTICE PARRISH, and JUSTICE LEE joined.

ASSOCIATE CHIEF JUSTICE NEHRING, opinion of the Court:

### INTRODUCTION

¶ 1    Michael Jones appeals from his convictions of murder, aggravated robbery, and unlawful distribution of a controlled substance. He alleges multiple errors at trial. First, Mr. Jones contends that the trial court erred when it admitted Y-STR DNA evidence linking Mr. Jones to the murder weapon. Second, Mr. Jones argues that the trial court erred when it denied admission of Mr. Jones's second police interview after the State used excerpts from the interview at trial. In the alternative, Mr. Jones contends that trial counsel's failure to put his statements

during the police interview into context constituted ineffective assistance of counsel. Third, Mr. Jones argues that the trial court erred when it admitted testimony that Mr. Jones claims was "anecdotal statistical evidence." Fourth, Mr. Jones contends that multiple statements made during the State's closing argument constituted prosecutorial misconduct. Fifth, Mr. Jones argues that the State's evidence was insufficient to sustain convictions for murder or aggravated robbery, and thus the trial court erred when it denied Mr. Jones's motion for a directed verdict. Finally, Mr. Jones alleges that the cumulative effect of the errors should undermine our confidence in the verdict. After review, we affirm Mr. Jones's convictions.

## BACKGROUND

¶ 2 On the afternoon of February 24, 2004, police officers Jim Spangenberg and Joshua Scharman were patrolling Poplar Grove Park in Salt Lake City when they spotted a Honda in the parking lot with its driver's side window rolled down. The vehicle piqued the officers' interest because there had recently been a rash of Honda thefts in the Salt Lake City area and the car was parked by itself. Officer Scharman ran the license plate number while Officer Spangenberg investigated the car. Officer Spangenberg opened the car door and sat in the driver's seat, looking for signs of tampering on the steering column. Officer Spangenberg did not initially notice anything unusual in the back seat of the Honda. Eventually, however, he noticed a knee poking out from underneath the towel in the backseat. The officers tilted the front seat forward and removed the towel and a black coat in the back seat, revealing the body of a deceased young woman who was later identified as Tara Brennan.

¶ 3 During her life, Ms. Brennan struggled with an addiction to cocaine. After several unsuccessful attempts in rehab programs, Ms. Brennan moved back into her mother's home in Salt Lake. On February 23, 2004, Ms. Brennan and her mother ran an errand at the bank to cash a check of Ms. Brennan's for approximately $350. Ms. Brennan gave $100 to her mother for car insurance and spent approximately $50 on a new car battery for her Honda. Ms. Brennan's mother had cleaned out the car in order to sell it. She testified that she wiped down the leather seats, vacuumed the carpet, and cleaned out the trunk. Around 6 p.m. that evening, February 23, 2004, Ms. Brennan told her mother "she wanted to take [the car] around the block to see how

2

it was running." Ms. Brennan's mother assumed that Ms. Brennan took the remainder of the money, approximately $250, from the cashed check with her when she left. Ms. Brennan's mother did not see her again.

¶ 4    When the officers found Ms. Brennan's body in the back of her Honda, she had a belt around her neck, stab wounds to her face, defensive wounds on her hands, and a "significant slash" to her neck. The cuts alone would not have been fatal. The medical examiner testified that the wounds suggested "some sort of struggle." The medical examiner certified the cause of death as strangulation and the manner of death as homicide. The medical examiner estimated Ms. Brennan's time of death was between 2 a.m. and 8 a.m. on February 24, 2004. From a toxicology report, the examiner also concluded that Ms. Brennan had ingested cocaine shortly before her death. Additionally, Ms. Brennan's pants were pulled down to her knees and she was not wearing underwear. But the evidence suggested that her clothes had been removed after the attack took place. The medical examiner completed a rape kit, but the results did not show signs of sexual intercourse or sexual assault.

¶ 5    The car's interior showed signs of a struggle. There was "blood throughout" the back of the vehicle and on the driver's seat. There were shoe prints on the ceiling and on a window, and a rear view mirror and directional signal were broken. Crime scene technicians also recovered a partial palm print, a number of shoe prints, several cigarette butts from inside and outside the car, and a blond hair from an outside door handle. Ms. Brennan's wallet was never recovered, and she had one penny in her pocket.

¶ 6    The technicians submitted the evidence to the crime lab, including an empty cigarette pack, a piece of adhesive note paper, a leather belt, an empty soda bottle, sunglasses, a lighter, the vehicle's rear view mirror and turn signal lever, and a partial seatbelt buckle strap, along with other items. The evidence was processed for fingerprints and DNA. The blond hair that had been recovered was not submitted because officers assumed it belonged to a lab technician who was at the crime scene, even though that technician had logged the hair as evidence. The crime lab developed DNA profiles from the cigarette butts found inside and outside the Honda using PCR STR DNA testing. A cigarette butt recovered from a cup holder in the Honda matched the DNA profile for Michael Jones. Two cigarette butts found outside the

car yielded DNA profiles for an unknown male and an unknown female.

¶ 7    Based on the DNA match from the cigarettes, police located and interviewed Mr. Jones in April 2004.  Officers showed him a picture of Ms. Brennan, and Mr. Jones recognized her immediately.  He said that he had seen her near the homeless shelter where he stayed and that Ms. Brennan had approached him to buy crack cocaine.  Mr. Jones told the officers that he helped Ms. Brennan purchase the narcotics, which they then smoked together in Ms. Brennan's car using Mr. Jones's pipe.  After that, Mr. Jones said they smoked cigarettes together.  Mr. Jones claimed that he was with Ms. Brennan for about forty-five minutes, and then he returned to the shelter and eventually spent the night in an overflow shelter.  Mr. Jones submitted to a blood draw during the interview.  The case then went cold for more than two years.

¶ 8    In 2006, at the request of the State, Sorenson Forensics performed a type of DNA testing, called Y-STR DNA, of fingernail clippings taken from Ms. Brennan and of the belt used to strangle her.  Y-STR DNA analysis tests only male DNA and thus allows for the identification of a very small amount of male DNA that might otherwise go undetected in the presence of a large amount of female DNA.  At Mr. Jones's trial, the State's experts would explain that a profile developed by the lab "matched" Mr. Jones in that it was a "rare profile" that excluded 99.6 percent of the male population.

¶ 9    Officers also collected DNA samples from thirty to forty men during the investigation but did not submit them for testing because the men had submitted the samples willingly and officers were seeking someone uncooperative.  Carlaya Yazzie,[1] a female suspect, was uncooperative when asked for a DNA sample and none was collected from her.  She remained a person of interest but could not be located at the time of Mr. Jones's trial.

---

[1] Ms. Yazzie was referred to by several different names throughout the case, including Karlaya Lynn Yazzie and Caroline Ozzie.  Despite this confusion, both parties appear to be referring to the same person at all times.

¶ 10 Detectives Taylor West and Mark Knighton interviewed Mr. Jones more extensively on May 11, 2006, two years after his initial interview. At that time, Mr. Jones said that when Ms. Brennan contacted him, she wanted to "buy some crack cocaine," and that he told her "he'd have to take her somewhere to go get it." According to Mr. Jones, Ms. Brennan then drove him to the Regis Hotel, where they purchased narcotics from "a guy named Joseph." Ms. Brennan gave Mr. Jones $30, and Mr. Jones bought three rocks of crack cocaine. Mr. Jones told the police that he had sold drugs for Joseph in the past but did not work for him after that night. Mr. Jones said that he and Ms. Brennan then drove to a parking lot at 400 South and State Street in downtown Salt Lake City, where they smoked the cocaine together in Ms. Brennan's car using Mr. Jones's pipe. He stated that Ms. Brennan drove him back to the homeless shelter and left. According to Mr. Jones, he then went to Motel 6, where he had rented a room with money he had earned "selling dope that day." Mr. Jones said he was kicked out of the motel room and returned to the shelter. After the interview, officers confirmed that a room at the Motel 6 was reserved under Mr. Jones's name, but that he did not stay there. The shelter log where Mr. Jones claimed he stayed did not indicate that he had checked in that night. The shelter director also testified that the logs are maintained by seasonal staff and that the logbook had inaccuracies.

¶ 11 Mr. Jones was charged with murder, a first-degree felony; aggravated robbery, a first-degree felony; and unlawful distribution of a controlled substance, a second-degree felony. At trial, a jury convicted Mr. Jones on all counts. The trial court sentenced Mr. Jones to consecutive statutory prison terms: five years to life for murder, five years to life for aggravated robbery, and one to fifteen years for distribution. Mr. Jones timely appealed. We have jurisdiction under Utah Code section 78A-3-102(3)(i).

**STANDARDS OF REVIEW**

¶ 12 Mr. Jones challenges the admission of the Y-STR DNA evidence[2] and the exclusion of the second police interview with

---

[2] The State argues that Mr. Jones did not preserve his challenge to the reliability of the principles underlying the Y-STR DNA
(con't.)

Mr. Jones. "[W]e review a trial court's decision to admit or exclude specific evidence for an abuse of discretion."[3]

¶ 13 Mr. Jones also alleges prosecutorial misconduct during the closing argument and challenges the admission of testimony using statistical evidence. These arguments are unpreserved; we therefore review them for plain error.[4] To establish plain error, the burden is on the defendant to demonstrate that "(i) [a]n error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful, i.e., absent the error, there is a reasonable likelihood of a more favorable outcome for the appellant."[5]

¶ 14 Mr. Jones claims ineffective assistance of counsel on the basis of counsel's failure to put Mr. Jones's statements during the second police interview into context, counsel's failure to object to the statistical evidence testimony, and counsel's failure to object to the State's closing argument. For "ineffective assistance of counsel claims, we review a lower court's purely factual findings for clear error, but [we] review the application of the law to the facts for correctness."[6]

¶ 15 Mr. Jones also alleges that the trial court erred when it denied his motion for a directed verdict, claiming that the State produced insufficient evidence to prove murder and aggravated robbery.[7] "[I]n considering an insufficiency-of-evidence claim, we

---

evidence and thus this court should not reach it. However, Mr. Jones challenges the conclusions of the Y-STR DNA test, not the underlying methodology, and we determine that this argument is preserved. *See infra* ¶¶ 19–20.

[3] *State v. Cruz-Meza*, 2003 UT 32, ¶ 8, 76 P.3d 1165.

[4] Mr. Jones concedes that the prosecutorial misconduct claim is unpreserved, but he asserts that his objection to the statistical testimony was preserved at trial. We conclude that it was not preserved. *See infra* ¶ 48.

[5] *State v. Holgate*, 2000 UT 74, ¶ 13, 10 P.3d 346 (alteration in original) (internal quotation marks omitted).

[6] *Archuleta v. Galetka*, 2011 UT 73, ¶ 25, 267 P.3d 232 (alteration in original) (internal quotation marks omitted).

[7] The State alleges that Mr. Jones did not preserve his

(con't.)

review the evidence and all reasonable inferences drawn therefrom in a light most favorable to the verdict."[8] Therefore, we will reverse "only when the evidence, so viewed, is sufficiently inconclusive or inherently improbable that reasonable minds must have entertained a reasonable doubt that the defendant committed the crime of which he or she was convicted."[9]

¶ 16 Finally, Mr. Jones argues that even if no one error is sufficient, the cumulative effect of the errors warrants reversal. In evaluating the cumulative error doctrine, "we will reverse only if the cumulative effect of the several errors undermines our confidence . . . that a fair trial was had."[10]

**ANALYSIS**

I. THE TRIAL COURT DID NOT ABUSE ITS DISCRETION IN ADMITTING THE Y-STR DNA EVIDENCE

¶ 17 Mr. Jones argues that the trial court erred when it admitted Y-STR DNA evidence because he contends that the State did not carry its burden of showing the reliability of the evidence and that the probative value of the evidence was substantially outweighed by the danger of unfair prejudice. We conclude that the trial court did not abuse its discretion.

*A. Procedural Background*

¶ 18 In the present case, the State filed a pretrial motion to admit Y-STR DNA results showing that evidence collected from the belt ligature and from underneath Ms. Brennan's fingernails matched Mr. Jones's DNA profile. At the time, the Salt Lake Legal Defender Association (LDA) represented Mr. Jones.[11] LDA was

---

challenge to the sufficiency of the evidence related to the murder count and thus it can only be reviewed for plain error. We determine the issue was properly preserved. *See infra* ¶¶ 66–67.

[8] *State v. Maestas*, 2012 UT 46, ¶ 177, 299 P.3d 892 (alteration in original) (internal quotation marks omitted).

[9] *State v. Nielsen*, 2014 UT 10, ¶ 30, 326 P.3d 645 (internal quotation marks omitted).

[10] *State v. Dunn*, 850 P.2d 1201, 1229 (Utah 1993) (alteration in original) (internal quotation marks omitted).

[11] LDA represented Mr. Jones pretrial from January 11, 2007,

(con't.)

also handling an unrelated criminal case, *State v. Johnson*,[12] in which the defendant challenged the admission of Y-STR DNA evidence. For reasons of economy, the parties in this case stipulated that the pleadings and evidentiary hearing from the *Johnson* case regarding the Y-STR DNA issue would be adopted for Mr. Jones's trial. Following a hearing, the *Johnson* court admitted the evidence under rule 702 of the Utah Rules of Evidence, concluding that the scientific principles underlying the Y-STR DNA testing are "generally accepted by the relevant scientific community," and that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice under Utah Rule of Evidence 403. The trial court in Mr. Jones's case therefore adopted the *Johnson* rulings and admitted the Y-STR DNA evidence against Mr. Jones.

### B. *The Issue Was Properly Preserved*

¶ 19 The State first contends that Mr. Jones did not preserve his reliability challenge under rule 702 and that therefore this court should not reach the issue. Mr. Jones does not contest the underlying principles or techniques of the Y-STR DNA technology; rather, Mr. Jones frames his 702 challenge as pertaining to the reliability of Y-STR DNA "as identification evidence."

¶ 20 "An issue is preserved for appeal when it has been presented to the district court in such a way that the court has an opportunity to rule on [it]."[13] As noted above, Mr. Jones and the State adopted the pleadings, argument, and court order from the evidentiary hearing in the *Johnson* case, during which defense counsel challenged the admissibility of the Y-STR DNA evidence on the very grounds that it was unreliable for identification purposes. We determine that counsel's challenge during the evidentiary hearing permitted the trial court to meaningfully rule on the issue. We therefore conclude that Mr. Jones's challenge to

---

until April 21, 2009, at which time LDA withdrew due to a conflict, and private counsel was appointed. Because the conflict no longer exists, LDA now represents Mr. Jones on appeal.

[12] Third Judicial Dist., No. 071900184.

[13] *Patterson v. Patterson*, 2011 UT 68, ¶ 12, 266 P.3d 828 (alteration in original) (internal quotation marks omitted).

the admission of the Y-STR DNA evidence for purposes of identification was preserved.

### C. Standard of Admissibility for Expert Testimony

¶ 21  The admission of the Y-STR DNA evidence is governed by Utah Rules of Evidence 702 and 403.[14]  "Rule 702 assigns to trial judges a 'gatekeeper' responsibility to screen out unreliable expert testimony."[15]  To that end, the rule establishes a two-part analysis to determine admissibility of expert testimony.[16]  First, the testimony must "help the trier of fact to understand the evidence or to determine a fact in issue."[17]  Second, scientific knowledge that "serve[s] as the basis for the expert testimony" must meet "a threshold showing that the principles or methods

---

[14] *See State v. Maestas*, 2012 UT 46, ¶ 121, 299 P.3d 892.  Rule 702 was amended in 2007 while the State's motion to admit the Y-STR DNA evidence was pending before the district court.  We interpreted the previous version of the rule to require that the scientific principles and techniques underlying the testimony be "inherently reliable" and properly applied to the facts by qualified experts. *State v. Rimmasch*, 775 P.2d 388, 398 n.7, 403 (Utah 1989).  We later explained that the 2007 amendment was not intended to make admission of expert testimony more difficult than under the *Rimmasch* test. *Eskelson ex rel. Eskelson v. Davis Hosp. & Med. Ctr.*, 2010 UT 59, ¶ 11, 242 P.3d 762.  Rather, the *Rimmasch* test was "subsumed in the new rule." *State v. Clopten*, 2009 UT 84, ¶ 38, 223 P.3d 1103.  Thus, as both parties agree, the analysis is the same under each version of rule 702.  Additionally, rule 702 was amended again in 2011, but the changes were "stylistic only" and did not "change any result in any ruling on evidence admissibility."  UTAH R. EVID. 702, 2011 advisory committee note.  For clarity, we cite to the rule as currently written, but we note that the result would be the same regardless of the version used.

[15] *State v. Perea*, 2013 UT 68, ¶ 74, 322 P.3d 624 (quoting UTAH R. EVID. 702, advisory committee note) (internal quotation marks omitted).

[16] *T-Mobile USA, Inc. v. Utah State Tax Comm'n*, 2011 UT 28, ¶ 42, 254 P.3d 752.

[17] UTAH R. EVID. 702(a).

that are underlying in the testimony (1) are reliable, (2) are based upon sufficient facts or data, and (3) have been reliably applied to the facts."[18]  This threshold showing may be satisfied if the underlying methods "are generally accepted by the relevant expert community."[19]  Finally, even if the testimony satisfies rule 702, the court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice" under rule 403.

### D.  Evidentiary Hearing

¶ 22 At the *Johnson* evidentiary hearing, Timothy Kupferschmid, the lab director of Sorenson Forensics,[20] testified about the use of Y-STR DNA.[21]  Y-STR DNA testing is a form of PCR STR testing, which stands for polymerase chain reaction using short tandem repeats.  Traditional PCR STR testing, also called autosomal STR, analyzes repeating chemical patterns, called haplotypes, at specific loci on the twenty-three pairs of chromosomes that contain DNA.  Mr. Kupferschmid testified that Y-STR PCR testing is similar to traditional PCR STR testing in that it looks to repeating patterns at certain loci; however, Y-STR PCR analyzes only the Y chromosome, which is carried only by males.  As Mr. Kupferschmid explained, because it analyzes only the Y chromosome, Y-STR PCR has several significant limitations compared to traditional PCR STR testing.  For example, because a male inherits the entire Y chromosome from his father (unlike other chromosomes which are a mix of paternal and maternal DNA), all men in the same paternal line have identical Y-chromosome DNA, and the test therefore cannot distinguish among them.[22]

---

[18] *Id.* 702(b).

[19] *Id.* 702(c).

[20] At the time of the testing, the Utah State Crime Lab did not have the capability to carry out Y-STR DNA testing; therefore, Sorenson Forensics conducted the Y-STR tests.

[21] *See also Maestas*, 2012 UT 46, ¶ 9 n.3 (describing Y-STR DNA).

[22] The possibility of a random genetic mutation on the Y chromosome is the same as with other chromosomes—

(con't.)

¶ 23 Mr. Kupferschmid also explained that Y-STR PCR testing is statistically much less powerful than traditional PCR STR testing. Traditional PCR STR compares patterns from twenty-three pairs of chromosomes that have undergone independent assortment of both paternal and maternal DNA. The possible DNA combinations are therefore quite numerous, and statistics for traditional PCR STR evidence can be calculated using the "product method," which, as Mr. Kupferschmid testified, often results in frequencies of "one in a billion, one in a trillion type numbers." In contrast, Mr. Kupferschmid explained that Y-STR DNA statistics "are much, much lower" because Y-STR testing looks only to the single Y chromosome that did not undergo random assortment. Calculation of occurrence must therefore use the less powerful "counting method."[23] Mr. Kupferschmid provided an example, explaining that if the sample was not observed in the database with a size of 3,561, the probability that a member of the population would have that sample is .08 percent. In turn, this means that 99.92 percent of the male population could be excluded as a possible donor.[24] Mr. Kupferschmid explained that a "match" meant that the individual could not be excluded as the source of the sample.

¶ 24 In the *Johnson* case, the district court concluded that Sorenson Forensics, the lab that analyzed the DNA samples in both cases, had the proper certifications and protocols to reliably

approximately three or four times every thousand generations, according to the State's expert.

[23] The probability equals the sum of occurrences of the haplotype in the database divided by the total number of samples in the database ($P = X/N$). The calculation is slightly different if the sample profile is not in the database ($P = 1 - \alpha^{1/N}$, where $\alpha$ is the confidence interval, usually 95 percent). *See* Scientific Working Group on DNA Analysis Methods, *Y-chromosome Short Tandem Repeat (Y-STR) Interpretation Guidelines*, FBI (Jan. 2009), http://www.fbi.gov/about-us/lab/forensic-science-communications/fsc/jan2009/index.htm/standards/2009_01_standards01.htm.

[24] Another Sorenson employee, Rebekah Kay, testified that finding zero matches in a database of 13,906 samples would yield a frequency of one out of 4,651 individuals.

conduct Y-STR DNA testing. The *Johnson* court further concluded that the scientific principles underlying Y-STR DNA testing are "correct" and are "generally accepted by the relevant scientific community." Lastly, the court concluded that the probative value of the Y-STR DNA evidence was not substantially outweighed by the risk of unfair prejudice. The trial court in Mr. Jones's case therefore adopted the *Johnson* rulings and admitted the Y-STR DNA evidence against Mr. Jones.

### E. The Trial Court Did not Err When It Admitted the Expert Testimony Under Rule 702

¶ 25 Mr. Jones first challenges admission of the Y-STR DNA evidence by arguing that the State did not carry its burden under rule 702 to show that the expert testimony was reliable in its use as identification evidence. Importantly, Mr. Jones does not challenge the underlying scientific methodology or claim that the test produced errant results in this case. Rather, he contends that the limitations inherent within the test, even a test performed correctly, render Y-STR DNA evidence unreliable for use in identification.

¶ 26 We first reiterate the role of courts in assessing the admissibility of expert testimony. Courts are to act as a "gatekeeper," ensuring a minimal "threshold" of reliability for the knowledge that serves as the basis of an expert's opinion. This is a crucial but limited function. We must be careful not to displace the province of the factfinder to weigh the evidence. As our court of appeals has astutely observed, under rule 702 "the line between assessing reliability and weighing evidence can be elusive."[25] We must be mindful of this important distinction because "the factfinder bears the ultimate responsibility for evaluating the accuracy, reliability, and weight of the testimony."[26] Acknowledging that the rule limits our task to considering whether "the underlying principles or methods . . . are generally

---

[25] *Gunn Hill Dairy Props., LLC v. L.A. Dep't of Water & Power*, 2012 UT App 20, ¶ 47, 269 P.3d 980.

[26] *Id.*

accepted by the relevant expert community,"[27] we turn now to the substance of Mr. Jones's challenge.

¶ 27 We have previously ruled on the admissibility of both traditional and Y-STR DNA evidence. In *State v. Butterfield*, we determined that traditional PCR STR testing is inherently reliable for identification, and we therefore allowed the admission of such evidence.[28] Then, in *State v. Maestas*, we upheld admission of Y-STR DNA evidence.[29] In that case, Mr. Maestas faced aggravated murder and aggravated burglary charges for a series of crimes committed with two accomplices.[30] To show that Mr. Maestas committed the murder alone, the State introduced Y-STR DNA evidence recovered from under the victim's fingernails that excluded the accomplices but could not rule out Mr. Maestas as the DNA's source.[31] We held that Y-STR DNA testing is generally accepted in the relevant scientific community and thus concluded that the trial court did not abuse its discretion in taking judicial notice of its reliability.[32] In affirming, we noted that scientific and forensic journals as well as other courts have recognized Y-STR DNA testing as reliable for excluding individuals as the source of an unknown sample.[33]

¶ 28 Mr. Jones argues that we should reach a different conclusion in the present case because he alleges the DNA evidence was used to identify him, not to exclude him from a class of possible perpetrators. He claims that Y-STR DNA evidence is scientifically unreliable for identification purposes. We are not persuaded. Where, as here, the testing procedures and results are not in question, we agree with the State that the statistical conclusions from the Y-STR DNA go to the weight of the

---

[27] UTAH R. EVID. 702(c).

[28] 2001 UT 59, ¶ 40, 27 P.3d 1133.

[29] 2012 UT 46, ¶ 140.

[30] *Id.* ¶¶ 1, 4–6.

[31] *Id.* ¶ 126.

[32] *Id.* ¶ 136.

[33] *Id.* ¶ 133 & nn.145–46.

testimony and not to the underlying scientific reliability.[34] We have previously upheld the reliability of the methodology for traditional PCR STR[35] and Y-STR DNA testing,[36] and Mr. Jones does not challenge those principles here. It is thus for the jury to determine whether the DNA evidence was sufficient to link Mr. Jones to the crime. We therefore conclude that the trial court did not abuse its discretion in admitting the Y-STR DNA evidence.

### F. The Trial Court Properly Admitted the DNA Testimony Under Rule 403

¶ 29 Mr. Jones next argues that the trial court should have ruled the Y-STR DNA evidence inadmissible under rule 403 of the Utah Rules of Evidence. Rule 403 imposes on Mr. Jones the heavy burden not only to show that the risk of unfair prejudice is greater than the probative value, but that it "substantially outweigh[s]" the probative value. Mr. Jones argues that the limitations of Y-STR DNA testing diminish its probative value such that the value

---

[34] We also note that Mr. Jones does not challenge the statistics or mathematical calculations presented at trial.

[35] *Butterfield*, 2001 UT 59, ¶ 40.

[36] *Maestas*, 2012 UT 46, ¶ 133 & nn.145–46. Other courts have also upheld the reliability of Y-STR testing. *See, e.g.*, *Mitchell v. Artus*, No. 07 Civ. 4688, 2008 WL 2262606, at *20 (S.D.N.Y. June 2, 2008) (explaining that a claim that Y-STR testing cannot determine the source to a statistical certainty "is an argument going to the weight of the evidence"); *People v. Stevey*, 148 Cal. Rptr. 3d 1, 11 (Ct. App. 2012) ("The fact that Y–STR DNA testing cannot positively identify an individual does not mean . . . that it is unreliable, or that the results are not probative."); *People v. Zapata*, 8 N.E.3d 1188, 1192–94 (Ill. App. Ct. 2014) (concluding that Y-STR testing has gained general acceptance in the relevant community); *People v. Wood*, No. 315379, 2014 WL 5470590 (Mich. Ct. App. Oct. 28, 2014) (admitting Y-STR DNA evidence under rule 702 and finding no rule 403 violation where the expert explained the test's limitations to the jury); *State v. Bander*, 208 P.3d 1242, 1255 (Wash. Ct. App. 2009) (recognizing the general acceptance of the counting method for Y-STR statistical analysis).

is substantially outweighed by the danger that it unfairly prejudiced him.

¶ 30 The "critical question" in a rule 403 analysis for unfair prejudice "is whether certainty [sic] testimony is so prejudicial that the jury will be unable to fairly weigh the evidence."[37] Additionally, "[e]vidence is not unfairly prejudicial because it tends to prove guilt, but because it tends to encourage the jury to find guilt from improper reasoning."[38] However, where expert testimony is presented accurately and where the evidence's scientific limitations are properly described to the jury, we cannot conclude that the testimony is unfairly prejudicial to the defendant or likely to confuse the jury. The fact that Y-STR DNA evidence is less powerful than other forms of DNA evidence does not automatically render it unfairly prejudicial to Mr. Jones or likely to mislead or confuse the jury. For example, in *Maestas*, we found that the Y-STR DNA evidence survived a rule 403 challenge because "it was likely that the jury was able to fairly weigh the evidence."[39] This was so because the State's expert carefully explained the testing process to the jury and spoke accurately about the test's conclusions.[40] We found that there was no rule 403 violation even when the expert spoke of the Y-STR DNA test as yielding a "match" to the defendant, because the expert had

---

[37] *State v. Guzman*, 2006 UT 12, ¶ 27, 133 P.3d 363; *see State v. Killpack*, 2008 UT 49, ¶ 53, 191 P.3d 17 ("Only when evidence poses a danger of rous[ing] the jury to overmastering hostility does it reach the level of unfair prejudice that rule 403 is designed to prevent." (alteration in original) (internal quotation marks omitted)).

[38] *United States v. Condon*, 720 F.3d 748, 755 (8th Cir. 2013) (internal quotation marks omitted); *see also Old Chief v. United States*, 519 U.S. 172, 180 (1997) (explaining that "unfair prejudice . . . speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged" (internal quotation marks omitted)).

[39] 2012 UT 46, ¶ 139.

[40] *Id.*

explained that a "match" simply meant the individual could not be excluded as a possible donor.[41]

¶ 31 In reviewing the expert testimony presented in the current case, we likewise find no rule 403 violation. Rebekah Kay, one of the State's experts, testified about Y-STR DNA technology and its use in the present case. She explained that Y-STR is a newer technology that allows for the analysis of male DNA when it is in the presence of large amounts of female DNA. Ms. Kay also described some of the limitations of the test, including the fact that all men in a paternal line will likely have an identical Y chromosome profile. On multiple occasions, Ms. Kay stated that the DNA profile from the belt and Ms. Brennan's fingernails was a "match" to Mr. Jones. However, on cross-examination, defense counsel questioned Ms. Kay on whether Y-STR DNA evidence could reveal a "match" to a specific person. Ms. Kay clarified that "when you are used to hearing a DNA match with traditional STRs, you're thinking that it's individualized. If it matches that person, it only matches that person." In contrast, she explained, with Y-STR, "it's not the same kind of match. It is a match to the profile but not necessarily the person."

¶ 32 Mr. Kupferschmid also appeared as an expert for the State and explained that, compared with traditional DNA testing, "[t]he statistics are much lower with Y-STR DNA profiles because . . . there is no cross-mingling of DNA." He then testified to the result in the present case, asserting that "approximately 99.6 percent of . . . the male population can be excluded" as a contributor of the DNA sample but that Mr. Jones could not be excluded.[42] When defense counsel crossed Mr. Kupferschmid on his statistical conclusion, Mr. Kupferschmid explained that, read another way, the frequency of Mr. Jones's DNA profile "is equivalent to one in 2681 individuals." He explained this means

---

[41] *Id.*

[42] In the State's motion to admit the Y-STR DNA evidence, the collected sample was compared to a database of 3,561 individuals. At trial, Mr. Kupferschmid based his statistical analysis on the database available at the time, which in 2010 included 8,028 samples.

that "every time you test . . . a male, the probability of that person having that particular DNA profile is approximately one in 2681."

¶ 33 We acknowledge that Y-STR DNA may be most helpful to the trier of fact when used to exclude possible suspects, as in *Maestas*.[43] However, juries are routinely called upon to evaluate complex scientific evidence, including DNA evidence. And any risk of confusion or unfair prejudice are minimized where, as here, the jury hears testimony from the experts of the various limitations of Y-STR DNA. Additionally, Mr. Jones had the opportunity on cross-examination to elicit details about Y-STR testing, including its specific limitations. And counsel did just that. Given the accurate and thorough expert testimony on the Y-STR DNA evidence, we conclude that the DNA testimony was properly explained to the jury such that the risk of unfair prejudice or confusion or misleading the jury did not substantially outweigh the probative value of the evidence. Thus, the trial court did not abuse its discretion in admitting the Y-STR DNA evidence against Mr. Jones.

¶ 34 We do, however, take this opportunity to note concerns regarding DNA evidence, even traditional PCR techniques. While we recognize the great potential benefit of DNA evidence as both inculpatory and exculpatory evidence, we agree with the United States Supreme Court that, "[g]iven the persuasiveness of [DNA] evidence in the eyes of the jury, it is important that it be presented in a fair and reliable manner."[44] For example, and as particularly relevant here, the Court recently warned that DNA evidence runs the risk of creating the so-called "prosecutor's fallacy," which occurs when a jury confuses random match probability with source probability.[45] Additionally, even at its best, DNA evidence

---

[43] 2012 UT 46, ¶ 9.

[44] *McDaniel v. Brown*, 558 U.S. 120, 136 (2010).

[45] *Id.* at 129. For example, if there is a 1 in 10,000 chance that the DNA from a random member of the public would match (random match probability), that does not lead to the conclusion that there is a 1 in 10,000 chance that the DNA sample came from someone other than the defendant (source probability) or that there is a 1 in 10,000 chance the defendant is innocent. If the relevant population from which the defendant came was

(con't.)

is not infallible; there are still concerns of, for example, inherent subjectivity or bias[46] and unavoidable error.[47]

¶ 35 Furthermore, we recognize the inherent differences in traditional PCR and Y-STR DNA tests and caution against courts and parties treating them identically. While the common scientific principles may render both DNA tests reliable as expert testimony, the disparity between their statistical conclusions is great and warrants careful consideration.[48] For this reason, we reiterate the responsibility of the State to properly and accurately present Y-STR DNA evidence, including its limitations, and the duty of defense counsel to counter any errant or incomplete testimony.

## II. THE TRIAL COURT DID NOT ABUSE ITS DISCRETION WHEN IT DENIED ADMISSION OF MR. JONES'S SECOND INTERVIEW WITH POLICE

¶ 36 Mr. Jones next argues that the trial court erred when it refused to admit the entire transcript or video of Mr. Jones's second interview with police after a State's witness testified to portions of the interview at trial. Alternatively, Mr. Jones contends that his counsel rendered ineffective assistance because counsel did not sufficiently place the State's excerpts of the

---

1 million, there would be 100 individuals who could match. Thus, the probability of the defendant being the source, based solely on the DNA evidence, is 1 out of 100, or 1 percent.

[46] *See* Erin Murphy, *The Art in the Science of DNA: A Layperson's Guide to the Subjectivity Inherent in Forensic DNA Typing*, 58 EMORY L.J. 489, 512 (2008) (explaining that DNA testing "is not a perfect and purely objective science" and that even "[g]ood inculpatory DNA methods nonetheless entail significant exercises of discretion on the part of forensic analysts").

[47] *See United States v. Porter*, No. F06277-89, 1994 WL 742297, at *8 (D.C. Super. Nov. 17, 1994) (requiring the prosecution to present evidence of the laboratory error rate alongside any DNA evidence).

[48] *Cf.* Murphy, *supra* note 46, at 493 ("[T]he use of DNA typing to inculpate a person . . . fundamentally differs from its use to exculpate.").

interview into context. We disagree and affirm the trial court's ruling.

¶ 37 Police interviewed Mr. Jones twice regarding Ms. Brennan's murder. The first interview occurred in April 2004, two months after the murder. Detectives Knighton and West asked Mr. Jones if he recognized a picture of Ms. Brennan. Mr. Jones said that he met Ms. Brennan at the homeless shelter and that they had "smoked some dope together" a number of months ago. He then answered questions about his activities with Ms. Brennan that evening, explaining that he helped her buy cocaine and then they smoked the cocaine and cigarettes in her car before he returned to the shelter. The detectives interviewed Mr. Jones a second time two years later, in May 2006. The second interview with the police was significantly longer than the first interview, and the detectives asked Mr. Jones for much greater detail about his activities on the night Ms. Brennan was murdered.

¶ 38 Mr. Jones did not testify at trial. The State called Detective Knighton as a witness. The detective described the first interview on April 13, 2004. He then testified extensively about the second interview with Mr. Jones on May 11, 2006. While Detective Knighton testified, he had a copy of the interview transcripts with him on the stand, but the transcripts were not entered into evidence. At one point, the State had Detective Knighton read directly from the transcript.

¶ 39 After the State's direct examination of Detective Knighton, defense counsel attempted to introduce a videotape of the entire second interview conducted in May 2006. The State objected, claiming that the additional statements by Mr. Jones constituted inadmissible hearsay under Utah Rule of Evidence 801. The district court delayed its ruling on the videotape's admissibility. In the meantime, defense counsel cross-examined Detective Knighton on all issues except the second interview. Later that same day, the trial court ruled that Mr. Jones could not admit the tape because it constituted hearsay. Instead, the court permitted defense counsel to cross-examine the detective on those portions of the second interview that he referenced during his testimony. Additionally, because the court's ruling was not made until the evening, and in the interests of allowing defense counsel to review the transcript of Detective Knighton's earlier testimony, defense counsel did not resume cross-examination of the detective

until the next day. Mr. Jones maintains that the court erred by not admitting the full interview. Alternatively, he argues that counsel was ineffective for failing to address more of the detective's testimony and for not attempting to admit portions of the interview when the trial court denied admission of the entire interview.

### A. The District Court Did not Abuse Its Discretion When It Denied Admission of the Transcript or Videotape of the Second Police Interview

¶ 40 Rule 106 of the Utah Rules of Evidence codifies in part the common law "rule of completeness," which permits introduction of an otherwise inadmissible statement if the opposing party introduces a portion of the statement.[49] The rule provides that "[w]hen a writing or recorded statement or part thereof is introduced by a party, any adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it."[50] It thus serves a protective function to prevent a "misleading impression created by taking matters out of context."[51] The rule establishes a "fairness" standard that

---

[49] *State v. Cruz-Meza*, 2003 UT 32, ¶ 9, 76 P.3d 1165.

[50] UTAH R. EVID. 106 (2010). This rule is identical to its federal counterpart. *See* FED. R. EVID. 106 (2010). Both rules were amended in 2011, but the amendments were stylistic and not intended to affect admissibility. *See* UTAH R. EVID. 106, 2011 advisory committee note; FED. R. EVID. 106, 2011 advisory committee note.

We may turn to federal law for "persuasive but not necessarily binding authority" in interpreting rule 106. *State v. Leleae*, 1999 UT App 368, ¶ 43 n.5, 993 P.2d 232; *see Langeland v. Monarch Motors, Inc.*, 952 P.2d 1058, 1062 n.4 (Utah 1998) ("[F]ederal cases interpreting analogous Federal Rules are compelling to our interpretation of the Utah Rules only insofar as their reasoning is logical and persuasive.").

[51] *Leleae*, 1999 UT App 368, ¶ 44 n.6 (quoting FED. R. EVID. 106, 1972 advisory committee note); *see Echo Acceptance Corp. v. Household Retail Servs., Inc.*, 267 F.3d 1068, 1089 (10th Cir. 2001) ("[Rule 106] functions as a defensive shield against potentially
(con't.)

requires "admission of those things that are relevant and necessary to qualify, explain, or place into context the portion already introduced."[52] The rule also contains a temporal component, recognizing "the inadequacy of repair work when delayed to a point later in the trial."[53]

¶ 41 Mr. Jones's argument raises two threshold issues regarding the application of rule 106. First, relying on the court of appeals decision in *State v. Leleae*,[54] Mr. Jones argues, and the State concedes, that rule 106 applies to transcribed oral statements that are used extensively at trial but are not actually introduced into evidence. However, this court has never directly addressed that question.[55] Second, the State argues that Mr. Jones's statements in

---

misleading evidence proffered by an opposing party.").

[52] *Cruz-Meza*, 2003 UT 32, ¶ 14 (internal quotation marks omitted).

[53] *Leleae*, 1999 UT App 368, ¶ 44 n.6 (quoting FED. R. EVID. 106, 1972 advisory committee note).

[54] *Id.* ¶ 44 n.7 ("Whether the statement was officially introduced as evidence or read from a transcript, as was done in this case, is irrelevant. The effect on the jury was the same.").

[55] Courts have not reached a uniform decision on whether rule 106 applies to statements that are not introduced into evidence. *Compare United States v. Pendas-Martinez*, 845 F.2d 938, 943 (11th Cir. 1988) (applying rule 106 to evidence that is not actually admitted but is used at trial in such a way that is "tantamount to the introduction . . . into evidence" (internal quotation marks omitted)), *United States v. Rubin*, 609 F.2d 51, 63 (2d Cir. 1979) (holding that rule 106 was invoked where statements "had been used extensively and quoted from copiously" by counsel on cross-examination), *and State v. Gray*, 511 S.E.2d 873, 876 (W. Va. 1998) ("[R]eading into the record from a document would be tantamount to introducing that document for purposes of Rule 106."), *with State v. Bauer*, 598 N.W.2d 352, 368 (Minn. 1999) (holding that the court need not admit the entire recording of a defendant's interview when police testified about statements the defendant made because rule 106 "is not applicable unless portions of the actual recording have been introduced into evidence"), *and Rials v. Duckworth*, 822 So. 2d 283, 287 (Miss. 2002)

(con't.)

the second interview constitute inadmissible hearsay and that rule 106 cannot overcome rule 802's prohibition against hearsay. Again, this court has not had the occasion to decide that issue.[56] We determine, however, that we need not resolve these issues today because Mr. Jones's claim would fail on the merits.

¶ 42 It is the duty of the trial court to determine which portions of the writing or recording "ought in fairness" be considered at the same time.[57]  This means that a court need only introduce those portions that, in its discretion, are "necessary to qualify, explain, or place into context the portion already introduced."[58]  Mr. Jones cites a number of instances during the detective's testimony that he claims were taken out of context and used to mislead the jury.  Upon review of the record, however, we determine that Detective Knighton's testimony sufficiently contextualized Mr. Jones's statements during the second police interview.[59]  For all contested statements, the detective accurately

---

("Rule 106 does not permit the introduction of an entire document when a witness was . . . only cross-examined by reading from a writing and no part of that document was introduced into evidence.").

[56] Courts have taken different approaches to whether rule 106 can overcome the prohibition on hearsay. *Compare United States v. Collicott*, 92 F.3d 973, 983 (9th Cir. 1996) ("Rule 106 does not compel admission of otherwise inadmissible hearsay evidence." (internal quotation marks omitted)), *and United States v. Wilkerson*, 84 F.3d 692, 696 (4th Cir. 1996) ("[Rule 106] would not render admissible the evidence which is otherwise inadmissible under the hearsay rules."), *with McAtee v. Commonwealth*, 413 S.W.3d 608, 629 (Ky. 2013) (permitting introduction of otherwise inadmissible hearsay statements under rule 106, but only "to the extent that an opposing party's introduction of an incomplete out-of-court statement would render the statement misleading or alter its perceived meaning" (internal quotation marks omitted)).

[57] UTAH R. EVID. 106 (2010).

[58] *Cruz-Meza*, 2003 UT 32, ¶ 14 (internal quotation marks omitted).

[59] For example, Mr. Jones argues that his statement during the interview, "I didn't touch her," was taken out of context.  He

(con't.)

related the substance of the interview, and defense counsel properly elicited further details during cross-examination. We thus conclude that the trial court did not abuse its discretion when it denied admission of the entire videotape or transcript of the second police interview.

### B. Defense Counsel Did not Render Ineffective Assistance in His Cross-Examination of Detective Knighton

¶ 43 Mr. Jones also asserts that his counsel provided ineffective assistance because counsel did not attempt to admit portions of the videotape, as the court suggested it would allow, and because counsel "[gave] up the cross-examination [of Detective Knighton] when it got difficult."

¶ 44 The United States Supreme Court announced a two-part test for ineffective assistance of counsel claims in *Strickland v. Washington*.[60] Mr. Jones must first show that "his counsel rendered a deficient performance in some demonstrable manner, which performance fell below an objective standard of reasonable professional judgment."[61] Second, Mr. Jones must demonstrate "that counsel's performance prejudiced the defendant."[62] Moreover, we must "indulge in the strong presumption that counsel's conduct falls within the wide range of reasonable

---

contends that, in context, the statement meant that he never had *sexual contact* with Ms. Brennan, but the State interpreted it as a claim that he never had *any physical contact* with her, arguing in closing that he had been untruthful because "DNA doesn't lie. He did touch her." However, the record from trial demonstrates that the detective accurately related the exchange from the interview during his testimony. And, during cross-examination, the full exchange from the interview was read to the jury twice. We therefore fail to see how admission of the transcript or video was necessary to clarify this point.

[60] 466 U.S. 668, 687 (1984); *see Archuleta v. Galetka*, 2011 UT 73, ¶ 38, 267 P.3d 232.

[61] *Archuleta*, 2011 UT 73, ¶ 38 (internal quotation marks omitted).

[62] *Id.* (internal quotation marks omitted).

professional assistance"[63] and that "under the circumstances, the challenged action might be considered sound trial strategy."[64]

¶ 45  As we explained above, rule 106 does not require the court to admit the entirety of a recording or writing, but only those portions that are necessary to clarify, explain, or place into context the admitted testimony.  Because we find that further clarification was not necessary for the statements Mr. Jones challenges, we also conclude that counsel did not render ineffective assistance.  Trial counsel repeatedly attempted to persuade the court that the entire second interview was needed, a position that Mr. Jones maintains on appeal.  When that effort failed, counsel cross-examined the detective about Mr. Jones's answers during the interview and also explained the evidence and drew favorable inferences during closing argument.  We thus determine that Mr. Jones has not shown that counsel's performance fell below the wide range of reasonable professional judgment.  Accordingly, Mr. Jones's claims regarding the second police interview fail.

### III.  THE DISTRICT COURT DID NOT ERR WHEN IT ADMITTED AN OFFICER'S TESTIMONY ABOUT THE FREQUENCY OF DRUG-RELATED CRIMES

¶ 46  Mr. Jones alleges that the trial court erred when it admitted testimony that he claims was "anecdotal statistical evidence" suggesting a high probability that he was guilty.  The State contends that this argument is unpreserved.  Mr. Jones argues that even if it is unpreserved, this court should reverse under the plain error doctrine or based on ineffective assistance of counsel.

¶ 47  We agree with the State that Mr. Jones's challenge to testimony by Salt Lake County police officer Scott Van Wagoner that 90 percent of crime in Salt Lake is driven by drugs is not preserved.  Officer Van Wagoner, who has worked in law enforcement for over twenty years including seven to ten years'

---

[63] *State v. Templin*, 805 P.2d 182, 186 (Utah 1990) (internal quotation marks omitted).

[64] *State v. Litherland*, 2000 UT 76, ¶ 19, 12 P.3d 92 (internal quotation marks omitted).

experience in a narcotics unit, testified for the State as an expert in local drug use. Officer Van Wagoner explained the process for making crack cocaine and also described typical drug transactions in the area and the crimes that can result. The State asked if Officer Van Wagoner had "seen bad things happen over $200[] worth of drugs or less," to which Officer Van Wagoner responded, "Yes, ma'am." When asked what kind of things, Officer Van Wagoner replied, "Robberies." At this point, defense counsel objected to the questioning for lack of foundation. The trial court overruled the objection, but encouraged the State to "lay a little bit more foundation." Mr. Jones now contests the line of questioning pursued by the State directly after the objection:

> Q: You are aware of crimes being committed in the pursuit of obtaining drugs?
>
> A: Yes, ma'am.
>
> Q: What percentage of the crime you see out there do you think is driven by drugs?
>
> A: 90 percent.
>
> Q: That high?
>
> A: Yes, ma'am.
>
> Q: And what kind of crimes have you seen committed in the pursuit of drugs?
>
> A: Robbery, burglary, aggravated assault, murder.
>
> . . . .
>
> Q: Over less than $200?
>
> A: Over less than $50 [worth] of drugs I have seen it.

The State then referred to this statistical evidence in closing, arguing that "[drugs] drive, as you heard, up to 90 percent of the crime that we have in this valley." Mr. Jones did not object to this statement during closing.

¶ 48 The State claims that the issue is not preserved because defense counsel objected to the earlier testimony but did not object to the evidence regarding the percentage of crime attributed to drugs. We agree. An objection must be specific enough "to

bring all claimed errors to the trial court's attention to give the court an opportunity to correct the errors if appropriate."[65]   At trial, defense counsel objected to Officer Van Wagoner's observations regarding the types of crimes that accompany drug use in the local area.  Mr. Jones now challenges Officer Van Wagoner's statements about the frequency of crimes related to drug use.  Officer Van Wagoner's observation that robberies have resulted from drug transactions is a separate issue from the statistical testimony.  Because Mr. Jones did not object to the statistical testimony, it cannot be said that the issue was brought to the attention of the trial court, and it is therefore unpreserved. Mr. Jones contends that we should still reverse under the doctrines of plain error and ineffective assistance of counsel, to which we now turn.

¶ 49 The plain error doctrine is an exception to the general rule of preservation—its "purpose is to permit us to avoid injustice."[66]   But it imposes a heavy burden on defendants to establish that: "(i) [a]n error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful, i.e., absent the error, there is a reasonable likelihood of a more favorable outcome for the appellant."[67]  Mr. Jones argues that our precedent makes clear that use of anecdotal statistical evidence is impermissible such that it should have been obvious to the trial court to intervene.

¶ 50 We have indeed condemned anecdotal statistical evidence when it concerns matters "not susceptible to quantitative analysis."[68]   For example, in *State v. Rammel*, the State called a detective to testify that, because most suspects lie when initially questioned by police, the detective did not think it was "unusual"

---

[65] *State v. Low*, 2008 UT 58, ¶ 17, 192 P.3d 867 (internal quotation marks omitted).

[66] *State v. Holgate*, 2000 UT 74, ¶ 13, 10 P.3d 346 (internal quotation marks omitted).

[67] *Id.* (alteration in original) (internal quotation marks omitted).

[68] *State v. Rammel*, 721 P.2d 498, 501 (Utah 1986) (internal quotation marks omitted).

that the defendant lied during his first interrogation.[69] The trial court admitted the detective as an expert qualified to opine on the likelihood that the defendant was telling the truth.[70] We determined it was error to admit the testimony because it was "utterly lacking" in foundation and there was no evidence to show that the detective was "uniquely qualified" as an expert to give such testimony.[71] We also held that such testimony was inadmissible under rule 403 because probabilities "are particularly inappropriate when used to establish facts not susceptible to quantitative analysis, such as whether a particular individual is telling the truth at any given time."[72] Similarly, in *State v. Iorg*, the court of appeals found testimony by an officer regarding a victim's veracity to be unfairly prejudicial.[73] Based on her experience, the officer testified that in at least 50 percent of cases, victims of sexual abuse do not report the incident until much later.[74] The officer then opined that it would not be unusual for the alleged victim in the case to report multiple incidents years later, and that it did not indicate untruthfulness on the part of the victim.[75] Citing *Rammel*, the court of appeals reversed, finding that the officer's testimony was more prejudicial than probative and "was clearly calculated to bolster [the victim's] believability" before the jury.[76]

¶ 51 We determine, however, that there was no plain error here. In contrast to *Rammel* and *Iorg*, the testimony in the present case did not go to witness veracity or other "matters not

---

[69] *Id* at 500.

[70] *Id.* at 500–01.

[71] *Id.* at 501. We nonetheless affirmed the conviction in *Rammel* because the error was harmless in light of significant evidence against the defendant. *Id.*

[72] *Id.* at 501(internal quotation marks omitted).

[73] 801 P.2d 938, 941 (Utah Ct. App. 1990).

[74] *Id.* at 939–41.

[75] *Id.* at 939–40.

[76] *Id.* at 942.

susceptible to quantitative analysis."[77] Rather, Officer Van Wagoner testified regarding the percentage of crimes linked to drug use—a metric that is quantifiable. And the State was clear that it did not seek official police statistics, but instead sought Officer Van Wagoner's professional opinion by asking about his personal observations. Officer Van Wagoner's extensive experience was adequate to lay a foundation for his qualifications to give such testimony. We conclude that there was no error that should have been obvious to the trial court.

¶ 52 We also determine that there was no plain error regarding Utah Rule of Evidence 403.[78] That Officer Van Wagoner testified that 90 percent of crimes he saw were related to drugs did not unfairly prejudice Mr. Jones. The officer had previously explained that he spent nearly a decade with the narcotics group, allowing the jury to infer that he likely had an increased exposure to drug-related crimes. Moreover, the jury was already aware that Ms. Brennan's death may have been drug-related both because the autopsy report revealed cocaine in Ms. Brennan's system and because Detective Knighton had testified that Mr. Jones stated that he used drugs with Ms. Brennan the night of her death. We therefore conclude that there was no plain error and that the trial court did not err when it did not strike

---

[77] *Id.* at 941.

[78] We have recognized that "inherent in certain categories of relevant evidence is an unusually strong propensity to unfairly prejudice, inflame, or mislead a jury." *State v. Lafferty*, 749 P.2d 1239, 1256 (Utah 1988). For such evidence, "the presumption shifts" and "the evidence's potential for unfair prejudice is presumed to outweigh its probativeness." *State v. Dibello*, 780 P.2d 1221, 1229 (Utah 1989) (explaining that such evidence "is uniquely subject to being used to distort the deliberative process and skew a trial's outcome"). Included within these categories is the use of "statistical evidence of matters not susceptible to quantitative analysis, such as witness veracity." *Id.* (citing *Rammel*, 721 P.2d at 501). However, as discussed above, the evidence in the instant case did not involve testimony on issues akin to witness veracity that are not capable of quantification. As such, the rule 403 presumption in favor of admission does not shift in this situation.

Officer Van Wagoner's testimony. Accordingly, defense counsel was not ineffective for failing to object to the testimony.

## IV. THE STATE DID NOT ENGAGE IN PROSECUTORIAL MISCONDUCT DURING CLOSING ARGUMENT

¶ 53 Mr. Jones argues that the State committed prosecutorial misconduct during its closing argument. He alleges that the State accused the defense of intentionally attempting to mislead the jury, expressed personal opinion about the evidence, and misstated evidence. He claims the district court erred for failing to sua sponte strike the State's arguments and either offering a curative instruction or ordering a mistrial. Mr. Jones concedes that these issues are unpreserved and therefore challenges them on the grounds of plain error or ineffective assistance of counsel.

¶ 54 The role of the prosecution is essential to the administration of justice, and we hold the prosecution to a high standard because "the prosecution's responsibility is that of 'a minister of justice and not simply that of an advocate.'"[79] Therefore, the prosecution must ensure "that guilt is decided upon the basis of sufficient evidence."[80] In *State v. Valdez*, we articulated a two-step inquiry to determine when the prosecution's conduct is "so objectionable as to merit a reversal in a criminal case": (1) "did the remarks call to the attention of the jurors matters which they would not be justified in considering in determining their verdict" and (2) were the jurors, "under the circumstances of the particular case, probably influenced by those remarks."[81] We have explained that it is improper for the prosecution to, for example, assert personal opinion or knowledge of a fact or encourage the jury to consider matters not in evidence.[82] However, we also recognize that "[a] prosecutor has the duty and right to argue the case based on the total picture

---

[79] *State v. Hay*, 859 P.2d 1, 7 (Utah 1993) (quoting UTAH R. PROF'L CONDUCT 3.8 cmt. 1).

[80] *Id.* (quoting UTAH R. PROF'L CONDUCT 3.8 cmt. 1).

[81] 513 P.2d 422, 426 (Utah 1973); *see State v. Ross*, 2007 UT 89, ¶ 54, 174 P.3d 628.

[82] *State v. Bakalov*, 1999 UT 45, ¶¶ 56, 58–59, 979 P.2d 799.

shown by the evidence or the lack thereof."[83]  And because these arguments are unpreserved, Mr. Jones must demonstrate that the errors, if any, should have been obvious to the trial court and resulted in prejudice to him.[84]  We determine that Mr. Jones has not carried this burden for any of his claims.

¶ 55  First, Mr. Jones alleges that the State repeatedly called the defense's arguments "red herrings," thereby accusing the defense of attempting to confuse and mislead the jury.  Mr. Jones argues that it was improper for the State to urge the jury to disregard the defense's "red herrings" and focus on the Y-STR DNA evidence because he contends the State "exaggerated the usefulness of the Y-STR evidence."  However, it is not improper for counsel to contest the opposing party's theories as irrelevant or improbable, permitted that it does not amount to a personal attack on defense counsel or an insinuation that the defense intends to mislead the jury.[85]  Here, the State's multiple references to "red herrings" did not amount to an accusation that Mr. Jones or his counsel intentionally tried to confuse the jury.  Rather, the State's references to "red herrings" were aimed at Mr. Jones's alternative theories—that the murder was committed by Carlaya Yazzie, a gang member, a random rapist, or a carjacker.  Thus, they specifically targeted Mr. Jones's trial strategy, not the personal character or motives of the defense counsel.  Additionally, the State did not improperly present the Y-STR DNA evidence during closing argument.  As discussed above, though Y-STR DNA has significant limitations, at trial the State's expert explained that to say a sample "matched" Mr. Jones meant only that it was a "rare profile" that excluded 99.6 percent of the

---

[83] *Ross*, 2007 UT 89, ¶ 55 (alteration in original) (internal quotation marks omitted); *see also State v. Dunn*, 850 P.2d 1201, 1223 (Utah 1993) ("[C]ounsel for each side has considerable latitude and may discuss fully his or her viewpoint of the evidence and the deductions arising therefrom.").

[84] *Supra* ¶¶ 48–49; *see State v. Holgate*, 2000 UT 74, ¶ 13, 10 P.3d 346.

[85] *United States v. Young*, 470 U.S. 1, 9 (1985) (asserting that counsel "must not be permitted to make unfounded and inflammatory attacks on the opposing advocate").

male population. Moreover, both the State and Mr. Jones elicited testimony regarding the limitations of the Y-STR DNA evidence. That the State chose to make it the hallmark of its case, despite these limitations, does not amount to misconduct. We therefore conclude that Mr. Jones has not established a plain error.

¶ 56 Second, Mr. Jones claims that the State committed prosecutorial misconduct for its arguments emphasizing the statistical evidence presented by Officer Van Wagoner. We have held that "a prosecutor engages in misconduct when he or she asserts personal knowledge of the facts in issue or expresses personal opinion."[86] However, there is no prosecutorial misconduct when the prosecutor is "merely drawing a permissible deduction from the evidence and stating what he predict[s] the jury would find from the evidence."[87]

¶ 57 At closing argument, the prosecution reiterated Officer Van Wagoner's testimony:

> [Drugs] drive, as you heard, up to 90 percent of the crime that we have in this valley. . . . [U]nfortunately, a drug addict hungry for a fix will rip off the retirement of his aging mother, . . . he will rob some[one] of their money, he will kill somebody . . . . And it's a sad fact in our society that that sort of thing happens, but unfortunately it's happening all the time. And it's what happened in this case."

We find that these closing remarks represent a permissible deduction based on Officer Van Wagoner's testimony regarding the frequency and type of crimes committed in relation to drug activity, and thus we conclude there was no plain error.

¶ 58 Third, Mr. Jones contends that the State again asserted personal knowledge and gave improper personal opinion when it described the commission of the crime by stating that Ms. Brennan was "yanked out of the seat belt . . . and pulled over [the] headrest. That would take considerable strength. I would submit to you the strength of a man." However, we again conclude that this was a permissible inference from the evidence.

---

[86] *State v. Parsons*, 781 P.2d 1275, 1284 (Utah 1989).

[87] *Id.*

The State argued that Ms. Brennan must have been stabbed in the front seat and then pulled over the headrest to the back because the evidence showed blood throughout the car, including the front seat, seat belt, headrest, and a pool of blood on the back floor mat. It is not impermissible for the State to infer that such a struggle would require significant strength on the part of the assailant. And the State very clearly asserted its argument as an inference by suggesting, without conclusively stating, that it must have been a man. Thus, we determine there was no plain error.

¶ 59 Fourth, Mr. Jones next argues that the State erred when it said that all the shoe prints in the car came from Ms. Brennan's boots. In truth, the evidence on this point was contradictory. A lab report showed that the partial impression from the car's headliner "shares similar design features with" Ms. Brennan's shoes. However, at trial, the crime lab supervisor, an expert on footwear identification, testified that the impressions from the car's headliner and inside the car window did not appear to match the tread of Ms. Brennan's boots. On appeal, the State therefore admits that such argument may have been in error. However, we agree with the State that any error was not obvious and did not prejudice Mr. Jones. The forensic report shows that "[d]ue to the limited detail in the impression" of the headliner shoe print, a positive match could not be made. Moreover, in light of the other evidence, we conclude that prosecution's misstatement regarding the shoe prints did not substantially prejudice Mr. Jones.

¶ 60 Fifth, Mr. Jones argues that the State asserted personal knowledge and expressed personal opinion when it defended the decision by the police not to test Mr. Jones's clothes seized from the jail. In his closing argument, Mr. Jones attempted to discredit the State's case by arguing that the police carried out a sloppy investigation. He argued that, for example, even though the police seized Mr. Jones's clothes while he was in custody, they never submitted the clothes for testing. On rebuttal, the prosecution explained that because three weeks passed between the murder and when Mr. Jones's clothes were seized in jail, Mr. Jones had "probably changed his clothes by then." The prosecution then added, "In fact, I'm pretty sure they are not the same clothes" that Mr. Jones was wearing the night of the murder. That was the reason, the State contended, that "the detective probably didn't run [the clothes] over to the crime lab." Mr. Jones

also challenges the State's assertion that Detective Knighton had gone to look for Mr. Jones's clothes at the shelter, but "[t]he shelter had destroyed them." At trial, Detective Knighton actually testified that Mr. Jones's locker at the shelter was "empty," not that the shelter had destroyed the clothes.

¶ 61 We conclude, however, that such statements constituted a permissible inference from Detective Knighton's trial testimony. The detective testified that Mr. Jones had said he wore a purple coat on the night of the murder, and Detective Knighton had attempted to locate the coat by searching the house of Mr. Jones's mother as well as Mr. Jones's locker at the shelter. Therefore, the prosecution drew reasonable inferences that Mr. Jones had changed clothes, no longer had the purple coat with him when he was in police custody, and thus the police did not have reason to submit the clothes for testing by the crime lab. Similarly, though the prosecution's statement that the shelter destroyed the clothes was inaccurate, it would be reasonable to infer that any clothes belonging to Mr. Jones that were not with him at the jail may have been lost, thrown away, or destroyed. Thus, there was no error that should have been obvious to the district court.

¶ 62 Sixth, Mr. Jones claims that the State's arguments regarding the defense's theories of a carjacking or gang violence referenced facts not in evidence. During rebuttal, the State again argued that Mr. Jones's alternative theories were "red herrings," asserting that "the only problem with that little theory [about carjacking] is, they didn't take the car," and that gangs "don't kill Stanford graduates, they kill rival gang members." The State appears to concede that such arguments improperly referred to facts not in evidence. However, we conclude that the arguments regarding the carjacking and gang violence did not prejudice Mr. Jones. Though Mr. Jones fleetingly addressed such theories during the trial, these arguments were not a mainstay of his trial strategy. Indeed, he did not even argue them in closing. We therefore conclude that the extra-record comments of the prosecution likely did not influence the jury on these issues.

¶ 63 Seventh, Mr. Jones claims that the State, in an effort to demonstrate inconsistencies in Mr. Jones's narrative, erroneously argued that Mr. Jones changed his story about whether Ms. Brennan had a pipe. Again, as the State concedes, the prosecution misstated the evidence on this point. The uncontroverted evidence at trial showed that Mr. Jones

consistently told police that he and Ms. Brennan used his pipe. We conclude, however, that this error did not prejudice Mr. Jones. The fact of whose pipe was used was not a matter of consequence before the jury, particularly where Mr. Jones had admitted to the detectives that he and Ms. Brennan had purchased and smoked narcotics together. And though the State used this supposed inconsistency to cast doubt on Mr. Jones's narrative, we find that the jury was unlikely to be influenced by such a trivial discrepancy.

¶ 64 In sum, we conclude that Mr. Jones has not demonstrated plain error for any of his claims. Accordingly, we hold that there was not a reasonable probability of a different outcome had Mr. Jones's counsel objected to the State's closing argument.[88] Therefore, Mr. Jones's claims for ineffective assistance of counsel fail.

## V. THE EVIDENCE WAS SUFFICIENT TO SUPPORT MR. JONES'S CONVICTIONS FOR MURDER AND AGGRAVATED ROBBERY

¶ 65 Mr. Jones argues that the evidence presented by the State was insufficient to sustain his convictions for murder and aggravated robbery,[89] and he therefore asks this court to reverse the convictions. After reviewing the record, we hold that Mr. Jones has not demonstrated there was insufficient evidence to support his convictions. We therefore affirm.

### A. Mr. Jones's Challenge to the Sufficiency of the Evidence Supporting His Murder Conviction Was Preserved

¶ 66 We first address the State's contention that Mr. Jones's argument regarding the murder charge was unpreserved. At the close of the State's evidence, Mr. Jones moved to dismiss the case on the basis that the State failed to establish the elements of the crimes. Regarding the motion to dismiss for the charges of

---

[88] *See Archuleta v. Galetka*, 2011 UT 73, ¶ 38, 267 P.3d 232 (holding that for an ineffective assistance of counsel claim, a defendant must demonstrate "that counsel's performance prejudiced the defendant" (internal quotation marks omitted)).

[89] Mr. Jones does not challenge his unlawful distribution conviction for insufficient evidence.

murder (count one) and unlawful distribution (count three), defense counsel stated, "I'm not going to address those rather extensively" because from "the evidence the Court has heard, . . . [the court] can make a ruling on [its] own." Defense counsel then extensively argued a sufficiency of the evidence claim regarding the aggravated robbery charge (count two), and the State responded only as to that charge. The trial court denied "the motion to dismiss count two." Defense counsel then requested the court rule on the murder and unlawful distribution charges, even though counsel admittedly "didn't argue it but our motion would include" those counts. Without further argument, the court denied the motion for all three counts.[90]

¶ 67 We hold that Mr. Jones preserved his challenge to the murder conviction. "An issue is preserved for appeal when it has been presented to the district court in such a way that the court has an opportunity to rule on [it]."[91] Mr. Jones moved for a directed verdict both after the State rested and at the close of all evidence, and his motion specifically addressed all three charges against him. Though counsel was brief, under the circumstances of this case, it is clear that Mr. Jones challenged the sufficiency of the evidence that identified him as the murderer because there were no other contested issues related to the murder charge. Thus, we determine that the court had notice of the claim and an opportunity to rule on it; therefore, the claim was preserved. We now turn to the merits of Mr. Jones's arguments challenging his murder and aggravated robbery charges.

---

[90] After the defense rested, Mr. Jones moved for directed verdict "with regard to all three[] counts." Again, defense counsel stated, "I don't think I will spend a great deal of time with regard to count one or count three." Defense counsel argued extensively regarding count two, the aggravated robbery charge. The court denied the motion as to count two. Defense counsel again asked for a ruling on counts one and three, noting that "I didn't argue them but I did make the motion." The court denied the motion for directed verdict as to counts one and three as well.

[91] *Patterson v. Patterson*, 2011 UT 68, ¶ 12, 266 P.3d 828 (alteration in original) (internal quotation marks omitted).

### B. *The Evidence Was Sufficient to Sustain Mr. Jones's Murder Conviction*

¶ 68   To succeed in overturning the verdict, Mr. Jones has the burden to "marshal the evidence in support of the verdict and then demonstrate that the evidence is insufficient when viewed in the light most favorable to the verdict."[92]   The standard of review for a sufficiency of the evidence is "highly deferential"[93]: "we will reverse a jury verdict only when the evidence . . . is sufficiently inconclusive or inherently improbable that reasonable minds must have entertained a reasonable doubt that the defendant committed the crime of which he or she was convicted."[94]

¶ 69   The State charged Mr. Jones with murder under three alternative theories: "intentionally or knowingly caus[ing] the death of another," "depraved indifference to human life," and felony murder.[95]   Drawing all inferences in the light most favorable to the verdict, we determine that the State provided sufficient evidence for the jury to find Mr. Jones guilty of murder. Detective Knighton testified that Mr. Jones admitted to being with Ms. Brennan in her car on the night of her death and to buying and smoking crack cocaine with her.  The autopsy report revealed that Ms. Brennan had ingested cocaine shortly before her death. DNA testing on cigarettes found inside the vehicle confirmed that Mr. Jones had been in the car.  The director of the homeless shelter testified that the shelter records indicated that Mr. Jones checked into the shelter every night from February 1 to February 22, that he did not check in on February 23—the night of Ms. Brennan's

---

[92] *State v. Pritchett*, 2003 UT 24, ¶ 22, 69 P.3d 1278 (internal quotation marks omitted).

[93] *State v. Nielsen*, 2014 UT 10, ¶ 30, 326 P.3d 645.

[94] *State v. Maestas*, 2012 UT 46, ¶ 302, 299 P.3d 892 (internal quotation marks omitted); *see also State v. Walker*, 765 P.2d 874, 874 (Utah 1988) ("So long as there is some evidence, including reasonable inferences, from which findings of all the requisite elements of the crime can reasonably be made, our inquiry stops." (internal quotation marks omitted)).

[95] UTAH CODE § 76-5-203(2).  The predicate offense charged in this case for felony murder was robbery under Utah Code section 76-5-203(1)(s).

murder—and that he checked in again on February 24. Detective Knighton testified that he was never able to locate the coat that Mr. Jones claimed to have been wearing on the night he met with Ms. Brennan. Ms. Brennan's mother testified that Ms. Brennan had left the house with approximately $200 in cash, but Ms. Brennan's wallet was never recovered. Experts from the state crime lab and Sorenson Forensics testified that Y-STR DNA testing from samples underneath Ms. Brennan's fingernails and the belt used to strangle her excluded 99.6 percent of the male population but could not exclude Mr. Jones.

¶ 70 Given the deferential standard on review, we conclude that the State presented sufficient evidence to allow the jury to reasonably find all required elements for the crime of murder.

### C. The Evidence Was Sufficient to Sustain Mr. Jones's Aggravated Robbery Conviction

¶ 71 We also conclude that the State presented sufficient evidence to support a guilty verdict on the charge of aggravated robbery. "A person commits aggravated robbery if in the course of committing robbery, he: (a) uses or threatens to use a dangerous weapon . . . ; [or] (b) causes serious bodily injury upon another[.]"[96]

¶ 72 At trial, Ms. Brennan's mother testified that Ms. Brennan often carried a wallet and that Ms. Brennan likely had about $200 when she left home on the night of her death. Detective Knighton testified that Mr. Jones stated that Ms. Brennan purchased the cocaine, but only used about $30 to make the purchase. Officer Van Wagoner testified that, in his experience, drug crimes are responsible for a substantial portion of crimes in the Salt Lake area and that robberies were commonly associated with drug crimes.

¶ 73 Mr. Jones argues that there are plausible alternatives to explain why the wallet was never found. However, in reviewing a jury verdict, we do not consider possible alternatives. Instead, we must view the evidence in the light most favorable to the verdict. We conclude that reasonable inferences drawn from the evidence presented support the jury's conviction for aggravated robbery.

---

[96] UTAH CODE § 76-6-302(1).

## VI. MR. JONES HAS NOT DEMONSTRATED CUMULATIVE ERROR THAT UNDERMINES OUR CONFIDENCE IN THE VERDICT

¶ 74 Lastly, Mr. Jones argues that his convictions should be reversed under the cumulative error doctrine because he alleges that the errors claimed above should undermine our confidence in the verdict. To evaluate a cumulative error claim, "we consider all the identified errors, as well as any errors we assume may have occurred."[97] However, "[i]f the claims are found on appeal to not constitute error, or the errors are found to be so minor as to result in no harm, the doctrine will not be applied."[98] Because we find that each of Mr. Jones's claims fails or does not constitute substantial error, our confidence in the fairness of his trial and his guilty verdict are not undermined. Therefore, we find no cumulative error.

## CONCLUSION

¶ 75 We determine that each of Mr. Jones's challenges to his convictions for murder, aggravated robbery, and unlawful distribution of a controlled substance fail. Accordingly, we affirm his convictions.

———————

[97] *State v. Maestas*, 2012 UT 46, ¶ 363, 299 P.3d 892 (internal quotation marks omitted).

[98] *Id.* (alteration in original) (internal quotation marks omitted).