2020 UT App 36

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
JOHNNY BRICKMAN WALL,
Appellant.

Amended Opinion∗
No. 20151017-CA
Filed March 5, 2020

Third District Court, Salt Lake Department
The Honorable James T. Blanch
No. 131903972

Troy L. Booher, Freyja Johnson, and Beth Kennedy,
Attorneys for Appellant

Sean D. Reyes and Tera J. Peterson, Attorneys
for Appellee

JUDGE DIANA HAGEN authored this Opinion, in which
JUDGES GREGORY K. ORME and JILL M. POHLMAN concurred.

HAGEN, Judge:

¶1     A jury convicted Johnny Brickman Wall of murdering his
ex-wife, Uta von Schwedler.[1] Wall appeals his conviction,

---

∗ This Amended Opinion replaces the opinion issued December
12, 2019, *State v. Wall*, 2019 UT App 205.

1. "This court typically does not include the names of crime
victims, witnesses, or other innocent parties in its decisions. We
make an exception in this case due to the considerable notoriety
this criminal episode has attracted. The [victim's] identity is well
known, and obscuring her identity in this decision would serve

(continued…)

arguing that there was insufficient evidence to convict him, that the district court erred in admitting certain DNA evidence, and that his trial counsel was ineffective in failing to object to the State's closing argument involving the DNA evidence. We conclude that Wall has not carried his burden on appeal to show there was insufficient evidence to support his murder conviction. Further, the district court did not exceed its discretion in admitting certain DNA evidence, and Wall's trial counsel did not perform deficiently in failing to object to the prosecutor's characterization of that evidence in closing argument. Accordingly, we affirm Wall's conviction.

BACKGROUND

*Marriage and Divorce*

¶2    In 1988, a mutual friend introduced Uta to Wall while they were each completing doctorate programs on the west coast. Wall and Uta married in 1990, and Wall graduated from medical school four years later. After medical school, Uta, Wall, and their newborn son moved to Utah for Wall's residency program. Over the next few years, they had three more children together.

¶3    By 2005, the marriage had failed and Uta moved out of the family home, leaving the four children to live primarily with Wall. The couple divorced in 2006.

---

(…continued)

no purpose." *State v. Chavez-Reyes*, 2015 UT App 202, ¶ 2 n.2, 357 P.3d 1012. Additionally, although we generally refer to relevant parties by their last names, we will refer to the victim in this case as Uta because that is how all of the witnesses referred to her at trial.

¶4    Wall and Uta responded differently to the divorce. According to their children, Wall was "very, very sad" and depressed after the divorce, but over time his mood changed from sadness to "anger, even hatred" toward Uta. Wall frequently complained to the children about Uta, saying that she was "a bad parent," that she was "selfish," and that she made his "life difficult." The children said that Wall never treated Uta "nicely or kindly" after the divorce. At one point, Wall "physically removed" Uta from his property when she "tried to come in the front yard" to pick up the children for her parent time.

¶5    Most people who knew Wall knew that he "despised" Uta. He asked his friends, "Would it be bad if Uta wasn't here anymore?" and "How would my life be if she weren't around?" He sent emails to Uta accusing her of immoral acts and threatening to "move away" with the children "or continue towards obtaining full custody." He blamed Uta for his unhappiness and accused her of "hurt[ing] people that matter deeply" to him. When she reached out to him regarding requests from the children's friends for weekend trips, he asked her to "please stop inserting [herself] in [his] parent time."

¶6    It was clear that Wall did not want Uta in the children's lives. The summer before her death, Wall took the children to California but refused to tell them when they were returning to Utah because he did not want them to tell Uta. If the children attempted to communicate with Uta while they were with Wall, "he would become very upset" and would sometimes take their phones away from them. He was uncooperative with Uta regarding parent-time exchanges and adjustments to the custody arrangement. Wall frequently ignored Uta's messages, and she had to organize parent-time schedules through her older children.

¶7    Uta's response to the divorce was quite different. Her friends, family, coworkers, and other acquaintances who testified at trial knew Uta to be "very outgoing, very friendly,

very cheerful," and "full of life." Those witnesses said her positive attitude continued after the divorce, and some people "certainly thought she was happier" after the divorce. She was welcoming to newcomers and frequently brought homemade treats to work or to social gatherings. She regularly engaged in physical activities such as swimming, running, hiking, skiing, and camping. Uta was in a "very happy" relationship with a man (the boyfriend) whom the children liked, and the two eldest children told family members that they "were so happy that Uta had [the boyfriend]" because he was "a really, really good match for Uta." No witness testified that Uta was unhappy or suicidal, except for Wall.

¶8     Uta was very involved in her children's lives. Although she "had a great love and passion for science," she arranged with her supervisor to work a "30-hour work week" because "it was important to her to be available for [her children] after [school] hours." "Uta's greatest pleasure in life was the love of her four children," and she wanted to spend more time with them. She attended their sporting events and musical performances and created photo albums for each of them.

¶9     One of the few things that upset Uta was attempting to work with Wall regarding the children. A few years after the divorce, Uta hired an attorney to file a petition to modify the divorce decree regarding parent time, and the court ordered mediation. Although Wall and Uta reached an agreement during mediation, Wall later refused to sign the proposed order. Thus, for years following the divorce, the custody arrangement was never sorted out and remained a "constant battle."

¶10    Early in September 2011, after years of unsuccessfully attempting to work out a better custody arrangement outside of court, Uta reached out to her attorney to discuss filing a new petition to modify the divorce decree and to consider moving to appoint a custody evaluator. Wall ignored Uta's inquiries related to the children, including whether he would either agree to sign the custody evaluation request or agree to the proposed parent-

time schedule for the upcoming school year. He also frequently ignored his own attorney's communications related to these requests. The week before Uta's death, in an apparent change of course, Wall agreed to sign the custody evaluation request the following week. But after he left the children in Uta's care for the weekend, Wall "excited[ly]" told a new acquaintance that "he was getting his kids back."

*Uta's Final Days*

¶11    The week before her death, Uta had made a discovery in her research that could advance a new treatment for childhood leukemia. According to her supervisor, the "long-term implications of that discovery" were "very exciting on a professional level, on a career level, both for Uta and . . . the lab, because [it would] lead[] to new peer-reviewed publications, grants, [and] presentations." This was a "milestone" in Uta's career that would have had "positive implications" for her.

¶12    On September 26, 2011, the day before her body was discovered, Uta had a meeting with her supervisor and another coworker related to this new discovery, and they were all "quite enthusiastic" because "[t]his was one of the biggest discoveries [they] had had thus far in the laboratory." Later that evening, Uta attended one of the children's soccer games and was "in a great mood." She spread out a blanket and shared treats with other parents. Uta told a fellow parent that she "had been camping that weekend with her kids and [her boyfriend]" and was looking forward to her upcoming trip to California with her two youngest children later that week while Wall took the two eldest children to visit universities back east.

¶13    After the soccer game, Wall arrived at Uta's house to take the children back home. When he arrived, Uta tried to talk with him to finalize the details for the California trip, but Wall "rolled up his window and ignored her." According to the children, Wall appeared annoyed on the drive home.

¶14    With the children out of the house, Uta went about her usual Monday evening routine of "deep cleaning" the house. Uta called her boyfriend and made plans with him for the following night. At around 10:45 p.m., Uta spoke with a friend over the phone about potential plans for the next day. That was the last time anyone heard from Uta.

*September 27, 2011*

¶15    The following morning, on September 27, 2011, Uta's neighbors did not see her at her kitchen table drinking coffee and reading her newspaper, as she did all other mornings. Instead, the newspaper remained in the driveway, and the garbage cans Uta put out for collection the night before remained on the street.

¶16    That same morning, Uta's eldest daughter awoke at around 6:00 a.m. and got ready for school. She searched the house for Wall, who usually drove her to the light rail station, but she could not find him anywhere. The eldest daughter testified that if Wall had to leave for the hospital in the middle of the night, he would "generally . . . text [her] or call [her]" to let her know, but he had not left her any messages that morning. After calling him twice with no answer, the eldest daughter walked to the station to go to school. Wall was spotted by the eldest daughter's schoolmate and her mother at 7:05 a.m., driving some distance away from and in the opposite direction of his house, and Wall still had not returned home to get the youngest children ready for school by the time the eldest son left for school around 7:30 a.m. But the two youngest children remembered speaking with Wall at some point before leaving for school. Specifically, they remembered seeing an injury to Wall's eye. Wall told them that he had slept outside on the porch and had been scratched by their dog, but the youngest daughter thought Wall was acting "weird, almost paranoid." Just after 8:00 a.m., a carwash facility photographed Wall dropping off his car. Wall took his car there to "detail the inside" and asked the

carwash attendant to focus "extra heavy" in the trunk cargo area and on a spot on the driver's side back seat.

¶17    After leaving his car to be detailed, Wall arrived late for appointments with patients. He "looked disheveled and anxious," appeared not to have bathed, and wore the same clothes as the previous day. A medical assistant noticed that he had a scratch on the left side of his face and that his left eye was "reddened and bloodshot." Although two people who worked in Wall's office said that this scratch looked like it was caused by a fingernail, "Wall volunteered an explanation for the scratch, saying that his dog jumped on him and scratched his face while he was sleeping outside." One of the assistants "thought [this] explanation was odd because [Wall] had his dog for a long time and she had never seen it scratch him before." When Wall noticed that his assistant was looking at additional scratches on his arms, he "quickly" rolled down his sleeves. After seeing one patient, Wall left to see an eye doctor and did not return to work.

¶18    When the eldest children returned home, they too noticed the scratch to Wall's face and eye. Wall told them that he had been sleeping outside occasionally over the past few months and that their dog had scratched him the night before while he slept outside on the porch. None of the children had ever seen Wall sleep outside on the porch, and none of them knew their dog to scratch anyone.

*The Crime Scene*

¶19    At around 7:45 p.m. on September 27, 2011, Uta's boyfriend went to visit her as they had planned the night before. Uta's garbage cans were still on the street, and her newspaper was still in the driveway. The boyfriend walked into her house through her unlocked door, which Uta normally locked before going to bed. He noticed that her bathroom door was slightly ajar and that the light was on. On his way to the bathroom, he walked past her bedroom and noticed that the blinds, which were always open, had been pulled shut. The boyfriend reached

the bathroom, announced his presence, opened the door, and found Uta dead in her bathtub with the cold water running but not overflowing. She wore only her pajama shorts, and her bloodied tank top was folded at the edge of the bathtub. The boyfriend called the police, who quickly arrived on the scene.

¶20   Upon entering the house, the first responders noted that there were pills strewn across the bedroom floor, a lamp had toppled over on the bed, and a vase and books from the nightstand had been knocked onto the floor. The comforter on the bed had been balled up in a way that appeared to conceal several dried bloodstains. The fitted bed sheet contained one large pool of blood and two smaller pools of blood that "show[ed] motion in three different directions," indicating "a sign of a real struggle." There was also a bloodstain on the pillowcase. In the bathroom, there was blood smeared on the sink and below the windowsill located above the bathtub, but there was no blood smeared on the walls between Uta's bedroom and bathroom or on any of the light switches. There was a shampoo bottle standing upright in the middle of the bathroom floor, which was usually kept in the windowsill above the bathtub. Under Uta's body, the first responders found a large kitchen knife. Also in the bathwater was a magazine, the sports section of the newspaper (which Uta never read), and the youngest daughter's photo album. There were dried bloodstains that looked like shoeprints on the kitchen floor.

¶21   Some of the officers testified that the scene appeared "suspicious," as if "there could have been a struggle," and that it "did not appear consistent with an overdose or accidental death." After leaving the scene, one of the officers contacted detectives to conduct an investigation.

*Wall's First Version of the Events of September 26 and 27*

¶22   Later that night, the detectives arrived at Wall's house to ask him "if he was willing to come down to [the] police station

to talk." The officers did not tell Wall what they wanted to talk about, and he did not ask them.

¶23 While Wall waited to be interviewed, the detectives first interviewed the boyfriend. The boyfriend was "compliant" and "helpful." He did not "have any trouble time-lining himself, explaining what he had been doing the weekend before, [or what happened] the day before. He seemed to be honest in all of his answers."

¶24 In contrast, Wall's responses to the detectives' questions were vague and he spoke in generalities rather than directly answering questions about what occurred the previous night. When the detectives asked where he went the night before after picking up the children from Uta's house, Wall said, "I don't know . . . I don't rem . . . I mean, I don't usually remember every . . . what I do, but . . . ah . . . usually what we do." (Omissions in original.) He went on tangents about what usually happened when he retrieved the children from Uta's house at the conclusion of her parent time. The officers kept redirecting Wall, stating, "So what happened last night, though, [Wall]? This was just last night." But Wall continued to respond to inquiries about the previous night with things the family "usually" did on Monday evenings or what the children "sometimes" did when they got back to Wall's house. Wall could not say if he had been home the entire night or if he had gone back to Uta's house after picking up the children. Wall evaded direct answers about the last time he had seen Uta, and he could not remember if he had recently touched Uta or the last time he had been inside Uta's house. When directly asked if he had been inside Uta's house on September 26 or 27, Wall responded, "I don't think so." When asked if there was "any reason, whatsoever, that [his] DNA . . . would be under [Uta's] fingernails," Wall responded, "I don't know." When he was asked if he killed Uta, he said, "I don't think I did it," "I don't think I was there," and, "If I did it, I did make a mistake, and I am sorry. But I don't think I did it."

¶25    Eventually, over the span of three hours, Wall gave an account of the things he did on September 27, 2011. He told the detectives that he went to a gas station near his house to purchase eggs between 6:45 a.m. and 7:00 a.m. He said he returned to the house and had breakfast with his two youngest children before taking them to school. Wall then went to a carwash facility because he had "extra time" that morning and there were "burritos spilled all over" the front passenger seat. He talked about going to his office, seeing the eye doctor regarding the scratch on his eye—which he again said his dog caused—and returning to the carwash to get his car before driving to his office at the hospital. At the hospital, Wall apparently parked his car and left his windows rolled down with his cell phone still inside the vehicle. He claimed that his cell phone had been stolen by the time he returned.

¶26    Wall could not tell the officers what he had done between 8:00 p.m. on September 26, 2011, and 6:45 a.m. the following day.

¶27    After interviewing Wall, the detectives had photographs taken of Wall's injuries and had a technician take his fingerprints. Wall was not arrested, and a detective arranged a ride home for him. One of the detectives testified at trial that Wall was "surprised" that he was being released and asked, "[S]o I'm not going to jail?" When the detective said he was not, Wall responded, "[B]ut I'm a monster."

*Wall's Conduct Following Uta's Death*

¶28    When Wall returned home from his interview with the detectives at around 2:30 a.m., he bluntly told the children, "Uta's dead and they think I did it." He told the youngest daughter "not to leave him alone because he was scared he would do something he would regret." Wall curled up "in the fetal position" and cried. He started "babbling and rambling" and "saying things along the line of: 'Am I a monster? Only a monster could have done this. How do I know what I do when I'm asleep? What if I did it and I don't remember?'" The children

and family friends testified that Wall repeatedly referred to himself as a monster in the days following Uta's death. The eldest son explained that Wall's ramblings made him "question[] [Wall's] involvement in [his] mother's death."

¶29   One of the children called a family friend to help Wall. Wall told this friend, "Uta is dead and they think I did it . . . ." When she asked him, "[D]id you do these things that—that the police said you did?" Wall responded, "If I did them, I don't remember." When this friend started looking for some of Wall's medications, he told her that he had been "sleeping outside recently" and that "the dog scratched him on his face." She asked him, "Why are you telling me this?" And then he showed her his eye. The friend noticed other scratches and "gouges" on Wall's body, which he quickly covered up. Because Wall was so "distraught," the friend wanted to offer him a sedative and asked him if he was familiar with Xanax. Even though he was a medical doctor and had twice prescribed himself Xanax after his divorce from Uta, Wall claimed not to know what it was. After the friend explained Xanax's purpose, Wall claimed to remember recently prescribing his mother Xanax "because she's afraid to fly." Wall then started telling the friend that "[a]ll he wanted was for Uta to be happy . . . and that's all he ever wanted," which the friend found to be "unusual because [she] felt like he was very angry at Uta" and did not believe that Wall really wanted her to be happy.

¶30   That same morning, Wall checked himself into a psychiatric facility where he stayed for about a week. While he was receiving treatment, the eldest son and a family friend visited him and asked him questions about Uta's death. During this conversation, Wall asked his son, "If the police found my phone there [at Uta's house,] what could I say to refute that?"

¶31   After Wall's release from psychiatric treatment, the children resumed living with him, but his behavior changed. Over time, Wall restricted the children's communication with Uta's family and the boyfriend. Wall told the children that the

boyfriend should have "come to *him* and comforted *him* in his time of need," and therefore the boyfriend should not be allowed to communicate with the children. (Emphasis added.) Wall also began telling his children that Uta committed suicide and told the youngest son, "[M]aybe it's better that she's dead." He became more "confrontational," "aggressive and intimidating" toward the children regarding Uta's death. The eldest son moved out of Wall's house the day after an "uncomfortable incident" in January 2012, in which Wall asked him "what [he] knew about [his] mom's death" and "what attorneys [he] had contacted." By May of that year, the three other children were also no longer living with Wall.

¶32  After Uta's death, the eldest son went to Uta's house to collect the children's photo albums to send them to Uta's family in Germany. He could not enter the house on his own because the spare key that was normally left outside for the children was missing and never found. After receiving help from the boyfriend to gain access to the house, the eldest son retrieved the albums and sent them to Germany. The eldest son informed Wall that he had sent the photo albums to Germany and that Wall would receive copies of the albums. In November 2012, Wall sued the eldest son for conversion and demanded to have the photo albums returned to him. In response, the eldest son filed a counterclaim against Wall for Uta's wrongful death.

*Wall's Second Version of the Events of September 26 and 27*

¶33  At a hearing on the wrongful death claim, at which Wall was present, the lead detective testified that he was actively investigating Uta's death as a homicide and that Wall was the primary suspect. He further testified that "DNA samples had been submitted to [a] lab for testing" and that those results were still pending.

¶34  After this hearing, Wall was deposed and asked about his whereabouts between September 26 and 27. During his deposition, Wall offered new details to account for how his or

Uta's DNA might have transferred to the areas tested by police. For instance, police took a swatch of fabric from the driver's side back seat where Wall had pointed out a spot at the carwash. Wall volunteered that, when he picked up the children from Uta's house the night before her death, Uta had opened the driver's side rear passenger door to hug the youngest daughter. Wall also claimed, for the first time, that he had caught Uta walking out of his garage later that night. Wall said he pursued Uta and "[s]he turned around and hit [him] in the face" and might have scratched him. He claimed that Uta had broken into his basement "multiple times in the previous months," but that he never reported it to the police.

¶35 Although the DNA results were still pending, counsel deposing Wall asked him, "Why is your DNA in Uta's bedroom?" He said he did not know if his DNA was there, but that Uta had invited him into her bedroom before "to seduce [him]," although he declined her advances. He could not remember when she last invited him into her bedroom but said that it could have been one or two months before her death.

¶36 Wall also testified in his deposition that Uta attempted suicide once on their honeymoon in 1991 and again while she was pregnant with their youngest son. But Wall said that he never reported either suicide attempt[2] or helped Uta seek counseling or treatment.

¶37 Finally, Wall gave a different version of events regarding his whereabouts on September 27, 2011, than what he told the detectives. This time, Wall explained that after allegedly chasing Uta away and being hit by her in the face, he went back inside his house to sleep. He woke up around 5:00 a.m. and decided to go to the hospital to work on his patients' charts but realized that he forgot his identification and could not enter the hospital. Wall

---

2. Wall claimed to have told Uta's father, but Uta's father had died before Uta and therefore could not corroborate this claim.

said he decided to go for a hike up a nearby canyon before the sun rose and before going to the carwash facility and then to work. Unlike the story he told at his police interview, this version of events did not include Wall being at home that morning with the two youngest children and the newly purchased eggs before school, even though the youngest children testified to that effect.

*The Investigation*

¶38 While Wall was getting psychiatric treatment in September 2011, Uta's body was sent to a medical examiner to perform an autopsy. Although some of the officers believed there could have been foul play and that her death appeared suspicious, an investigator's report provided to the medical examiner said her death was "a probable suicide overdose." The medical examiner later testified that, had the "case been presented . . . as a suspicious death or homicide," he would have taken more photographs of the body and conducted a more thorough examination. The medical examiner noted "sharp force injuries on her left wrist . . . in three separate locations," a bruise on her lip, an abrasion on her cheek, and a laceration to her lower leg. Uta also had internal hemorrhages in her neck, which could have been sustained by a "broad and/or soft blunt object being applied in that location," and petechiae (burst capillaries) in her right eye, each of which were consistent with strangulation. Uta had a near-lethal dose of Xanax in her system, but there were no pill remnants in her stomach. The medical examiner was "not looking specifically for an injection site anywhere," because the case was brought to him as a probable suicide, but he testified that any of the injuries on Uta's body "could potentially obscure an injection site" if that was how the Xanax got into her system. The medical examiner explained that the nature of Uta's wounds was "not like anything [he] had ever seen in a suicide," because they appeared to be defensive rather than self-inflicted, and that he had concerns that the police were "dealing with a homicide."

¶39    After conducting the autopsy, the medical examiner concluded that Uta's cause of death was drowning but could not determine the manner of death. Based on his concerns that the manner of death may have been homicide, the medical examiner asked the officers to meet with him to discuss his findings. Because he could not determine how the Xanax got into her system, he asked the officers if they were conducting further investigation. The sergeant in charge of the case at that time "basically [said] that we think this is a suicide, period." The medical examiner told the officers that he was "not going to call this a suicide," and that the manner of death was "undetermined" based on what he knew. The medical examiner explained that the scene of the crime was "suspicious," that it appeared "more consistent with homicide than anything else," and that "but for the Xanax" in Uta's system, he "would have certified the death as a homicide."

¶40    A few weeks after the medical examiner performed the autopsy, the investigation stalled. Between November 2011 and November 2012, the boyfriend, an ex-boyfriend, the eldest son, and some of Uta's other family members kept pressing the police to investigate the case as a homicide. Finally, in November 2012, the investigation resumed in earnest.

¶41    A crime scene reconstructionist reviewed the photographs taken by the investigators the night Uta's body was found, visited Uta's house after it had been cleaned, and reviewed the items collected from the scene. The reconstructionist determined that Uta had been murdered and that the murderer had staged the scene to look like a suicide. The reconstructionist, who had special training and expertise in "blood pattern interpretation," analyzed the blood patterns on Uta's comforter and fitted sheet and concluded that a "violent struggle" occurred and that Uta struggled "under a restraint." The reconstructionist also analyzed Uta's bloodied tank top that had been folded and laid over the side of the bathtub. Although there was one saturated spot on the chest where it appeared Uta had held her bleeding wrist against her body, there was "no hand transfer" of blood

onto the tank top where one would expect to see it if Uta had removed the tank top herself. The reconstructionist opined that the bloodstains in the bathroom under the windowsill and on the sink appeared to have occurred while Uta was being pushed into the bathroom. The bloodstains were not consistent with Uta being "intoxicated and stumbling around her house on her own" because there were no apparent patterns on the walls of someone staggering or touching surfaces to get from the bedroom to the bathroom.

¶42    Forensic testing also revealed that there were bloody shoeprints in the bathroom and the bedroom and that there was a bloody spot above Uta's headboard. These blood stains initially went undetected because they had been cleaned up before the boyfriend discovered Uta's body and first responders arrived at the scene. A crime scene technician discovered these bloodstains using a special chemical that changes color when it comes into contact with blood protein, which helped to make the "partially visible" or "faint" bloodstains in the bedroom and on the bathroom floor more visible.

¶43    Unlike the faint bloodstains that were overlooked by the first responders, dried-blood shoeprints had been immediately apparent in Uta's kitchen. The crime scene reconstructionist explained that those stains would not have come from "rehydrated blood" because if the blood had dried and a person with a wet shoe stepped into the blood and started walking, that person "might get flakes . . . [or] portions" of blood, but it would not make a full bloody shoeprint. The reconstructionist concluded that the evidence showed another person had been present and attacked Uta and that "this scene was a homicide that was staged to look like a suicide."

¶44    Investigators searched to find where the Xanax may have come from. Uta was never prescribed Xanax, she had never told anyone she had taken it, and no prescription bottle for it was found at her house. Even though Uta sometimes stored her medication in film canisters, those canisters were always labeled.

Further, Uta kept a yearly "medicine calendar" in which she dutifully documented the medications she took, the amount she took, and her "level of wellness" related to those medications. Nowhere on these calendars did Uta document taking Xanax.

¶45   On the other hand, Wall had twice prescribed himself .5 milligrams of Xanax following the divorce. And, just four months before Uta's death, Wall wrote a prescription for the highest dosage of immediate release Xanax, which is 2 milligrams, and filled that prescription at a pharmacy that he had never used before or since. Wall claimed that he filled this prescription for his mother who lived in California, but in their initial interviews with investigators, Wall's parents could not confirm whether they ever received such a medication.

¶46   At the crime scene, the investigators collected, among other things, a pillowcase and scrapings from underneath Uta's fingernails to be tested for DNA evidence. Using different techniques, investigators extracted DNA samples from each of these items. The forensic analysis revealed that Wall was a possible contributor to the DNA located on the pillowcase, but Wall could not be included or excluded as a possible contributor to the male DNA located under Uta's fingernails. Uta's ex-boyfriend, the boyfriend, and the first responders were all excluded as possible contributors to the DNA located under Uta's fingernails.

¶47   More than two years after Uta's death, the State charged Wall with murder. During the four-week jury trial, the State presented the evidence detailed above. The jury also heard, among other things, from two forensic pathologists who were given Uta's autopsy report with photographs, police reports, crime scene photographs, crime laboratory reports, photographs of Wall's face taken on September 27, 2011, the report from Wall's eye doctor, the preliminary hearing testimony of the medical examiner, and Uta's healthcare reports. Both agreed that Uta's wounds to her wrists and leg were not self-inflicted and were instead defensive wounds. They both determined that,

although there was a near-lethal dose of Xanax in her system, the low level of Xanax in Uta's stomach was consistent with either the drug being injected into her body or swallowed as a slurry—meaning that the pills had been crushed and mixed with a liquid. Both of the forensic pathologists concluded that Uta's manner of death was homicide.

¶48   The jury convicted Wall of murder. Wall now appeals.

ISSUES AND STANDARDS OF REVIEW

¶49   Wall argues that the evidence of guilt was insufficient to support the jury's verdict "because the inference that [Wall] killed [Uta] is less likely than the inference that [Uta] killed herself, whether accidentally or intentionally." "In considering an insufficiency-of-evidence claim, we review the evidence and all reasonable inferences drawn therefrom in a light most favorable to the verdict." *State v. Jones*, 2015 UT 19, ¶ 15, 345 P.3d 1195 (cleaned up). "We will reverse only when the evidence, so viewed, is sufficiently inconclusive or inherently improbable that reasonable minds must have entertained a reasonable doubt that the defendant committed the crime of which he or she was convicted." *Id.* (cleaned up).

¶50   Wall next argues that the district court erroneously admitted certain DNA evidence through expert testimony. We review the district court's decision to admit expert testimony under an abuse-of-discretion standard, and "we will not reverse a decision to admit or exclude expert testimony unless the decision exceeds the limits of reasonability." *Walker v. Hansen*, 2003 UT App 237, ¶ 12, 74 P.3d 635 (cleaned up).

¶51   Wall also argues that his trial counsel "was ineffective for failing to object when the State mischaracterized the DNA results" in closing argument. "An ineffective assistance of counsel claim raised for the first time on appeal presents a question of law. In such a situation, there is no lower court ruling to review and we must decide whether the defendant was

deprived of the effective assistance of counsel as a matter of law." *State v. Archuleta*, 2019 UT App 136, ¶ 17, 449 P.3d 223 (cleaned up).

ANALYSIS

I. Sufficiency of the Evidence

¶52    Wall argues that "the evidence is insufficient to exclude reasonable doubt." Specifically, he argues that "the State's construal of circumstantial evidence . . . that [Uta] was attacked, restrained, and injected with Xanax, all without leaving restraint marks on her body or any DNA evidence . . . was physically possible," but "it [was] not the most reasonable explanation." Instead, he claims that the most reasonable explanation is that Uta's death was an accident or a suicide.

¶53    To succeed on a sufficiency of the evidence challenge, the appellant "has the burden to marshal the evidence in support of the verdict and then demonstrate that the evidence is insufficient when viewed in the light most favorable to the verdict." *State v. Jones*, 2015 UT 19, ¶ 68, 345 P.3d 1195 (cleaned up). On appeal, we do not reweigh the evidence presented to the jury. "When the evidence presented is conflicting or disputed, the jury serves as the exclusive judge of both the credibility of witnesses and the weight to be given particular evidence." *State v. Workman*, 852 P.2d 981, 984 (Utah 1993). "Ordinarily, a reviewing court may not reassess credibility or reweigh the evidence, but must resolve conflicts in the evidence in favor of the jury verdict." *Id.* We are thus restricted to "evaluat[ing] whether the evidence is so inconclusive or inherently improbable that it could not support a finding of guilt beyond a reasonable doubt." *Id.*

¶54    Wall concedes throughout his brief that "suicide and homicide are at least equally probable." He says that all of the evidence is "consistent with homicide" but that the same evidence is at least "equally consistent" with suicide and that some evidence is "more consistent" with suicide. In making this

argument, Wall relies on language from *State v. Cristobal*, 2010 UT App 228, 238 P.3d 1096. In that case, we suggested that "[w]hen the evidence supports more than one possible conclusion, none more likely than the other, the choice of one possibility over another can be no more than speculation." *Id.* ¶ 16. But as our supreme court has since clarified, "the fact that we can identify an 'equally' plausible alternative inference is not nearly enough to set [a] verdict aside." *State v. Ashcraft*, 2015 UT 5, ¶ 25, 349 P.3d 664. On appeal, "[t]he question presented is not whether some other (innocent) inference might have been reasonable," but "simply whether the inference adopted by the jury was sustainable." *Id.* ¶ 27.

¶55 Wall argues that the jury's verdict was not based on reasonable inferences, but on speculation. He posits that the "distinction [between reasonable inferences and speculation] turns on whether there are equally likely interpretations of the evidence." Here, because "the evidence and inferences did not preclude the reasonable alternative hypothesis presented by the defense," he contends that the jury's verdict was based on speculation, which does not constitute proof beyond a reasonable doubt. (Quoting *State v. Cardona-Gueton*, 2012 UT App 336, ¶ 11, 291 P.3d 847 (cleaned up).) Despite the broad language used in some of our past opinions, "the law is well established that the existence of one or more alternate reasonable hypotheses does not necessarily prevent the jury from concluding that a defendant is guilty beyond a reasonable doubt." *Cardona-Gueton*, 2012 UT App 336, ¶ 11 (cleaned up). "It is the exclusive province of the jury to weigh the competing theories of the case, in light of the evidence presented and the reasonable inferences drawn therefrom, and to conclude which one they believe." *Id.* (cleaned up). Therefore, "despite the existence of theoretically 'reasonable' hypotheses, it is within the province of the jury to judge the credibility of the testimony, assign weight to the evidence, and reject these alternate hypotheses." *State v. Blubaugh*, 904 P.2d 688, 694–95 (Utah Ct. App. 1995). Indeed, "a finding that a defendant is guilty beyond a reasonable doubt is necessarily a finding that any alternative

hypothesis of innocence presented at trial was *not* reasonable under the jury's view of the evidence." *Cardona-Gueton*, 2012 UT App 336, ¶ 12.

¶56 Consequently, it is not enough for Wall to show that the evidence would have permitted a reasonable juror to accept the defense's theory that Uta's death was an accident or suicide. "These are fair arguments for counsel to present to the jury in closing." *Ashcraft*, 2015 UT 5, ¶ 24. But once the jury has rejected the alternative explanation offered by the defense, "an appellate court will reverse such a finding only where no reasonable juror could have taken that view of the evidence." *Cardona-Gueton*, 2012 UT App 336, ¶ 12. "The question presented is not whether we can conceive of alternative (innocent) inferences to draw from individual pieces of evidence, or even whether we would have reached the verdict embraced by the jury." *Ashcraft*, 2015 UT 5, ¶ 24. Instead, it is "simply whether the jury's verdict is reasonable in light of all of the evidence taken cumulatively, under a standard of review that yields deference to all reasonable inferences supporting the jury's verdict." *Id.*

¶57 The jury's determination that Uta was murdered is well supported by the evidence admitted at trial. As to the crime scene, multiple witnesses testified that there was evidence of a "violent struggle." Items throughout Uta's bedroom were knocked over onto the floor and the bed, even though there was no blood pattern on the walls to suggest that Uta might have caused the disarray by stumbling around the room on her own. The blood patterns on Uta's comforter and sheet showed that Uta struggled "under a restraint." The bloodstains under the bathroom windowsill and sink were consistent with Uta being pushed into the bathroom with blood on her hands. The lack of hand-transfer bloodstains on Uta's tank top suggested that she had not removed it herself. And although the defense expert drew different conclusions from this same evidence, the weight to be given to such conflicting expert opinions is solely the province of the jury. *See State v. Berchtold*, 357 P.2d 183, 186 (Utah 1960).

¶58    As to Uta's injuries, she sustained defensive wounds on her arms and on the back of one of her legs, suggesting that she tried to defend herself from an attacker. She had hemorrhaging in her neck and petechiae in her eye, each of which is consistent with strangulation. She also had male DNA under her fingernails, which is consistent with scratching an attacker.

¶59    Additional evidence supported the prosecution's theory that a second person left the home shortly after Uta had been subdued. The blinds in Uta's bathroom and bedroom—which were normally open—had been shut, and bloody shoeprints in those rooms had been wiped clean, as well as a bloody spot above Uta's headboard. In the kitchen, which had no blinds, no effort had been made to clean up dried-blood shoeprints. The prints did not match any of the first responders' or the boyfriend's shoes. In any event, the reconstructionist testified that Uta's blood would have dried in the hours between her death and the discovery of her body and that the prints were inconsistent with the later transfer of rehydrated blood. Evidence that someone had tracked fresh blood through the kitchen around the time of Uta's death and had tried to clean up blood in those rooms where the activity could take place behind closed blinds was strong evidence supporting the jury's conclusion that Uta was murdered.

¶60    Other evidence further undercut the defense's theory that Uta's death was a suicide or accidental overdose. Without exception, the witnesses who knew Uta testified that she was not suicidal. To the contrary, she was excited about a breakthrough at work, was looking forward to an upcoming trip with the younger children, and was making plans up until the night before her death. And although there was a near-lethal dose of Xanax found in Uta's system, there was no evidence that Uta had ever been prescribed or taken Xanax, and no prescription bottles or labeled film canisters for the drug were found at Uta's house. In addition, there were no pill remnants in her stomach that would account for the concentration of Xanax in her system, supporting the prosecution's theory that Uta was either injected

with or forced to swallow a slurry containing a high concentration of Xanax.

¶61 Two forensic pathologists reviewed all of the relevant reports from the police, medical practitioners, and the autopsy and testified that the cause of death was homicide. Even the medical examiner, who had been told that Uta's death was "a probable suicide overdose," found the evidence to be "more consistent with homicide than anything else," refused "to call this a suicide," and "would have certified the death as a homicide" had it not been for the ambiguity created by the Xanax in Uta's system. The medical examiner's uncertainty was understandable because, as the crime scene reconstructionist explained, "this scene was a homicide that was staged to look like a suicide." Based on all of this evidence, a reasonable jury could find beyond a reasonable doubt that Uta was murdered.

¶62 There was also sufficient evidence to support the jury's determination that Wall was the murderer. Wall had a well-established motive to kill Uta. They were involved in an acrimonious ongoing custody dispute, and those familiar with him knew that Wall "despised" Uta. He often complained that she made his "life difficult" and blamed her for his unhappiness. Mere days before Uta's body was discovered, Wall informed a new acquaintance that he was "getting his kids back." And after her death, Wall told their youngest son that "maybe it's better that she's dead."

¶63 Wall also had the opportunity to commit the murder. He could not account for his whereabouts around the time of Uta's death. In his first police interview, Wall told the detectives that he had gone to a gas station near his house to purchase eggs between 6:45 a.m. and 7:00 a.m. and then returned home to make breakfast. But his older children indicated that he was already gone when they awoke for school around 6:00 a.m. and had not returned by the time the eldest son left for school at 7:30 a.m. In a deposition more than a year later, he claimed that he woke up

early and went to the hospital to work on charts, even though a hospital witness testified that doctors know that they cannot access the medical records office before 8:00 a.m. Wall claimed that he could not access the hospital because he had forgotten his identification and then decided to go on a pre-dawn hike, despite having left no word for his children, as had been his practice. No one could corroborate his whereabouts between the time the children went to bed the night before and 7:05 a.m. the next morning when he was spotted driving his car some distance from his house.[3] He later appeared for work disheveled and wearing the same clothes as the day before as if he had not been home to sleep or get ready for work. Not only did Wall have the time and opportunity to commit the murder, the jury had ample reason to find his evolving story incredible.

¶64 The lack of forced entry at Uta's home also supported the conclusion that the crime was not committed by a stranger. When Uta's body was discovered, the door to her house was unlocked, even though Uta always locked it before bed. The eldest son testified that Uta kept a spare key hidden outside the house for the children and that the key was missing after Uta's

---

3. On appeal, Wall makes much of the fact that the autopsy report did not document any changes to Uta's skin, known as "washerwoman syndrome," from having been immersed in water for a long period of time. Wall argues that the absence of such evidence conclusively proves that Uta's death occurred shortly before her body was found in the evening rather than during the early morning hours when Wall had no alibi. But the medical examiner testified that, although he did not note washerwoman changes in his report, he had not been looking for them because the death had not been presented as a possible homicide. And there was conflicting testimony from defense and State experts about whether washerwoman changes could be seen in the autopsy photographs. The jury could reasonably conclude that the apparent absence of washerwoman syndrome was entitled to less weight than the defense believed it deserved.

death. The jury could reasonably infer that Wall knew of the spare key and used it to enter the house on the night of the murder.

¶65   Wall also had access to the drug used to subdue Uta. In fact, he had recently written a prescription for the highest dose of Xanax, purportedly for his mother who lived in California, although she could not confirm receiving it. The jury could reasonably conclude that Wall filled the prescription at a pharmacy that he had not used before or since (and later feigned ignorance of the drug) to make it harder to link him to the drug he used in the course of killing Uta.

¶66   The jury could also reasonably conclude that Wall's behavior and statements showed consciousness of guilt. When the police asked him if he killed Uta, he responded with equivocal statements such as, "I don't know, I don't think I did it," "I don't think I was there," and "If I did it, I made a mistake, and I am sorry. But I don't think I did it." When Wall was released after the police interview, he was surprised and said, "[B]ut I'm a monster." When he returned home, Wall announced to the children, "Uta's dead and they think I did it." Rather than comfort the children, Wall acted "distraught," curled into the fetal position and cried, and forced the children to take care of him because "he was scared he would do something he would regret." He kept calling himself a monster and repeatedly asked the children, "What if I did it and I don't remember?"

¶67   Furthermore, Wall volunteered implausible explanations for physical evidence that might connect him to the crime. Even before Uta's body was discovered, Wall tried to explain the scratch on his eye by telling everyone that he had recently started sleeping on his porch and that his dog scratched him while he slept. No one ever saw him sleep on the porch, and no one had ever seen the dog scratch anyone. And to those who testified, the scratch to Wall's eye looked like it was caused by a fingernail. Wall also had scratches on his arms and legs that he quickly covered up when people noticed. When interviewed by

police, he was vague about the last time he had seen or touched Uta and whether he might have been in her house around the time of her death. He told the police that his cell phone was stolen from his unsecured car that same day but later asked his eldest son, "If the police found my phone [at Uta's house] what could I say to refute that?"

¶68    Significantly, Wall offered new explanations when he knew that DNA test results were pending. When he was deposed in the wrongful death lawsuit, Wall offered a new story that would explain why his DNA might be found under Uta's fingernails. For the first time, Wall claimed that he had not only seen Uta again after picking up the children on the night of her death, but that the two of them had gotten into an altercation and that she had struck him in the face. He also claimed that she had once tried to seduce him in her bedroom, which could explain why his DNA might be found at the crime scene. And Wall took care to mention that Uta had leaned into the back seat of his car the night before her death to give their daughter a hug, touching the part of the seat that the investigators collected to search for DNA evidence, although her DNA ultimately was not found in that sample. The jury could reasonably infer that Wall offered these explanations because he knew that the results of the DNA testing could link him to the crime.

¶69    While this summary is by no means an exhaustive review of all of the evidence supporting Wall's guilt, it is more than sufficient to demonstrate that the jury's verdict was supported by substantial evidence. This is not a case in which the evidence was so inconclusive or inherently improbable that it could not support a finding of guilt beyond a reasonable doubt. The State presented sufficient evidence to support the jury's conclusion that Uta was murdered and that Wall was her murderer.

## II. Admissibility of DNA Evidence

¶70    Wall next argues that the district court should have excluded the DNA evidence that was extracted from Uta's

pillowcase because "the State failed to make the threshold showing that [the forensic laboratory's] methodology was reliable or reliably applied" under rule 702(b) of the Utah Rules of Evidence. Rule 702(b) provides that "[s]cientific, technical or other specialized knowledge may serve as the basis for expert testimony only if there is a threshold showing that the principles or methods that are underlying the testimony" are "reliable," "based upon sufficient facts or data," and "have been reliably applied to the facts." Utah R. Evid. 702(b).

¶71   In applying rule 702(b), the district court "performs an important gatekeeping function, intended to ensure that only reliable expert testimony will be presented to the jury." *Gunn Hill Dairy Props., LLC v. Los Angeles Dep't of Water & Power*, 2012 UT App 20, ¶ 31, 269 P.3d 980. But this function is "limited" to "ensuring a minimal 'threshold' of reliability for the knowledge that serves as the basis of an expert's opinion" and must not "displace the province of the factfinder to weigh the evidence." *State v. Jones*, 2015 UT 19, ¶ 26, 345 P.3d 1195 (cleaned up). Although "the line between assessing reliability and weighing evidence can be elusive," appellate courts "must be mindful of this important distinction because the factfinder bears the ultimate responsibility for evaluating the accuracy, reliability, and weight of the testimony." *Id.* (cleaned up). "When performing their gatekeeping function, judges should approach expert testimony with rational skepticism. But the degree of scrutiny that should be applied to expert testimony by trial judges is not so rigorous as to be satisfied only by scientific or other specialized principles or methods that are free of controversy or that meet any fixed set of criteria fashioned to test reliability." *Gunn Hill Dairy Props.*, 2012 UT App 20, ¶ 32 (cleaned up).

¶72   Before trial, Wall moved to exclude, among other things, the DNA results from the pillowcase, arguing that he "should be excluded as a possible contributor" because some alleles were missing from the sample and because the "statistical probability" calculated by the forensic laboratory was unreliable. The district

court held an evidentiary hearing to determine whether the evidence and expert testimony met the minimum threshold of reliability necessary for its admission.

¶73   At that hearing, the court heard testimony from two experts from the forensic laboratory that conducted the DNA tests and one expert for the defense. All of the experts testified to DNA composition in general and forensic DNA testing. DNA is made up of twenty-three pairs of chromosomes and is found in most cells of the human body. Twenty-two of the chromosomal pairs control non-sex traits (autosomal) and the twenty-third chromosome is sex determining—either male or female. Except for identical twins, no person has the same DNA as another person. But only one percent of human DNA differs from person to person based on short tandem repeats (STRs), which are patterns of alleles at a certain locus within human DNA. "At each given locus, you would expect to see two alleles because you get one from your mother and one from your father." But sometimes there is only one allele at a given locus, which occurs "when you get the same [allele] from both your mother and your father." Forensic DNA analysts focus on these patterns to discover the identity of the source of the DNA.

¶74   When conducting an autosomal STR analysis, as was done in this case, the forensic analyst targets sixteen of the individualized STR locations along the twenty-two autosomal chromosomes. There are five steps to the test: extraction, quantification (determining how much DNA was isolated at the targeted sixteen loci), amplification (creating copies of the DNA sample by splitting the DNA "ladder" down the middle and re-bonding the DNA to create a sufficient number of copies of the sample for testing), the actual testing (using florescent dye and an electrophoresis machine), and analysis.

¶75   The experts further explained that, during the testing stage, the analyst injects the DNA with fluorescent dye and runs it through an electrophoresis machine, which measures the alleles' fluorescence in "relative fluorescence units" (RFUs).

Then, a software program creates a graph of this data and shows the "peaks" of each allele (i.e., the strength of the fluorescence) at the sixteen tested loci. The peaks will appear taller or shorter depending on how much DNA is present at that allele and a taller peak means it "has more DNA." If an allele reaches a peak of fifty RFUs, then it has reached the "analytical threshold" and the analyst can rely on that as a match of alleles on that locus between the crime-scene sample and the possible-contributor sample. If an allele's peak is below fifty RFUs, it is unclear whether the allele represents DNA or "background noise."

¶76   After providing this background, the analysts from the forensic laboratory (the State's experts) then testified directly to the DNA samples and comparisons in this case. Relevant to the sample collected from the pillowcase using the M-Vac process,[4] the State's experts found that Wall's entire autosomal STR profile was present in that sample, but that three of the alleles were detected below the analytical threshold. Because three alleles did not meet the analytical threshold, the State's experts followed the laboratory's policy to conduct a second amplification test to see if the results were reproduced. The second test produced the same results,[5] and the analysts determined that Wall could not be excluded as a possible contributor because a "repeat" event "gives more credence or

---

4. According to expert testimony, "[a]n M-Vac is basically like a DNA wet vac[uum]" that has a "buffer" in it that will not degrade or harm the DNA sample. The M-Vac soaks the targeted area and then "sucks up the liquid." The liquid is "run through a series of filters" to extract the DNA from the targeted area for forensic analysis.

5. One of the alleles that was above the analytical threshold in the first test was below the threshold in the second test. But the State's experts explained in great detail why this could occur and why it did not undermine their confidence in that allele.

reliability to that event." The State's experts explained that a finding that a person cannot be excluded as a possible contributor does not mean that the person is an "actual" contributor. The defense's expert disagreed with the laboratory's policy to retest the sample and concluded that any DNA sample with an allele that does not reach the analytical threshold should amount to an exclusion of the individual as a possible contributor to the sample.

¶77 Following the hearing, the court issued a detailed written order denying Wall's motion to exclude the evidence. The court explained that although the director of the forensic laboratory determined that there was "questionable activity" with respect to alleles on three loci within the DNA sample, it is the laboratory's policy "not to disregard it." Instead, the director determined that these results showed that Wall could not be excluded as a possible contributor to the DNA sample because the three loci where the alleles were recorded "below the analytic threshold at the points where [Wall's] alleles should have been" showed that "it is possible these loci could contain" Wall's alleles based on the results of the repeat amplification. The court found that many laboratories have similar policies and that this particular laboratory's "policy has been subjected to third party assessment and has been approved by auditing companies and at least one previous director of the lab." The court explained that although there was conflicting expert testimony from the State and the defense regarding the reliability of the results of this DNA sample, it was "not the court's role to decide which expert is correct," and the court determined that Wall's "objection to this evidence is a matter of weight rather than reliability." The court concluded that the State "made a threshold showing of reliability" and admitted the evidence.

¶78 On appeal, Wall asserts that the forensic laboratory's "director . . . testified that the [laboratory's] method of including [Wall] as a possible contributor was *unreliable*." But as articulated above, the director testified that data below the analytical

threshold is "not reliable" with respect to conclusively including or excluding an individual for statistical purposes, but that the laboratory is "not going to put blinders on and just completely ignore it." This is because the presence of "some activity" or "amplification" at these loci shows that something is "detected." The director explained that ignoring the below-threshold information with respect to certain alleles and excluding an individual as a possible contributor can make "exclusion inaccurate."

¶79    Wall also asserts that the "State did not demonstrate that . . . [the laboratory's] methods were reliable and reliably applied to include [Wall] as a possible contributor." But the district court made specific findings that the laboratory's policy against excluding a person where a possible match is detected below analytical thresholds is consistent with the practice of other laboratories and that recent audits and third-party assessments have approved this policy. The district court acted well within its discretion in relying on this evidence to conclude that the laboratory's methods met the minimum threshold of reliability.

¶80    We therefore conclude that Wall has not shown that the district court exceeded its discretion when it admitted the DNA evidence and expert testimony under rule 702(b) of the Utah Rules of Evidence.

### III. Ineffective Assistance of Counsel

¶81    Finally, Wall argues that his trial counsel was ineffective in failing to object to the prosecutors' statements in closing argument that he asserts misconstrued the DNA evidence.[6] To

---

6. In his opening brief, Wall argued that trial counsel was also ineffective for failing to object to certain statements elicited on direct examination of the State's expert witnesses. But at oral argument, appellate counsel conceded that "the issue about the

(continued…)

prove that trial counsel was ineffective, Wall must show that trial "counsel's performance was deficient, in that it fell below an objective standard of reasonable professional judgment," and "that counsel's deficient performance was prejudicial." *State v. Litherland*, 2000 UT 76, ¶ 19, 12 P.3d 92; *see also Strickland v. Washington*, 466 U.S. 668, 687–88 (1984). The "failure to establish either prong of the test is fatal to an ineffective assistance of counsel claim." *State v. Torres*, 2018 UT App 113, ¶ 14, 427 P.3d 550 (cleaned up). Consequently, "there is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697. Here, Wall has not shown that his counsel performed deficiently.

¶82 When we review a claim of deficient performance, we "presume[] that counsel has rendered adequate assistance," and "if the challenged act or omission might be considered sound trial strategy, we will not find that it demonstrates inadequacy of counsel." *State v. Kingston*, 2002 UT App 103, ¶ 8, 46 P.3d 761 (cleaned up). "When we review an attorney's failure to object to a prosecutor's statements during closing argument, the question is not whether the prosecutor's comments were proper, but *whether they were so improper* that counsel's only defensible choice was to interrupt those comments with an objection." *State v. Houston*, 2015 UT 40, ¶ 76, 353 P.3d 55 (cleaned up). This is because "counsel for both sides have considerable latitude in their closing arguments. They have the right to fully discuss

---

(…continued)
DNA is all about closing argument and closing argument only." This court asked the clarifying question, "Your [ineffective assistance of counsel claim] is failure to object during closing arguments, not the failure to object during the expert testimony?" And appellate counsel responded, "That's right." We therefore do not address whether trial counsel was ineffective for failing to object during direct examination of the State's expert witnesses.

from their perspectives the evidence and all inferences and deductions it supports." *Id.* (cleaned up). "Moreover, a prosecutor has the duty and right to argue the case based on the total picture shown by the evidence." *Id.* (cleaned up). Through this lens, we review the three points in the State's closing arguments to which Wall claims any reasonably competent trial counsel would have lodged an objection.

¶83    First, Wall challenges a statement made by the prosecutor in the first part of the State's closing arguments. The prosecutor stated, "We have male DNA being found under [Uta's] right-hand fingernail clippings. I would submit to you it was as if [Uta] was standing in this courtroom and pointing to [Wall] as her killer." Wall argues that this statement violated the court's order related to DNA evidence, which informed the parties that they could not use the DNA evidence to show conclusively that he was the contributor to the DNA, and therefore trial counsel was deficient in failing to object to it. The prosecutor correctly noted that male DNA was found under Uta's fingernail, not that Wall's DNA was underneath her fingernail, but essentially told the jury that the reasonable inference was that Wall's DNA was under Uta's fingernail. Assuming without deciding that this statement was improper, trial counsel may have based his decision to forgo an objection on sound trial strategy, choosing instead to undermine the State's characterization of the fingernail-DNA evidence in his own closing argument. This is exactly what trial counsel did. Trial counsel argued that the DNA evidence was "just meaningless," it "doesn't prove anything" because Wall was excluded as a possible contributor to some of the DNA samples, the DNA test results were "unreliable," and the DNA evidence "doesn't put [Wall] in [Uta's] house." We therefore conclude counsel was not deficient in failing to object to the State's characterization of the fingernail-DNA evidence. *See State v. King*, 2012 UT App 203, ¶ 14, 283 P.3d 980 (explaining that counsel performs deficiently only where there is no "conceivable tactical basis for counsel's actions" (cleaned up)).

¶84   Next, Wall argues that in the State's rebuttal closing argument, the prosecutor improperly told the jury that it was in a better position to determine Uta's cause of death because the medical examiner who wrote the report "didn't know about all the DNA work" and that counsel should have objected to that statement. The challenged statement was a direct response to statements made by Wall's trial counsel in his closing argument. Specifically, Wall's counsel made the following argument:

> Here's the part you guys have been waiting for, the conclusion. There's been a lot of evidence introduced here. And we've heard a lot of evidence about the relationship of two people, about their lives, their mental states, their problems. You've heard a lot of evidence about forensics, about shoe identification, blood stains and pathology. But the most critical testimony in this case, the most critical input came from the state medical examiner.

He went on to explain that the medical examiner's testimony was key because it "indicated that [Uta's death] was either a homicide or suicide" and that the medical examiner's "opinions were affected by the presence of Xanax in [Uta's] body." The defense theory was that the medical examiner's inability to conclude one way or the other "establishe[d] reasonable doubt."

¶85   In rebuttal, the prosecutor opened with the following response:

> I'd like to start first with the last thing that was said [in trial counsel's closing argument], the critical piece of evidence was the medical examiner. And I want you to remember what the medical examiner said because you all have a better position than he did when he wrote that report. He said he didn't have [Uta's] medical and mental health records. He didn't know about all the DNA work. He didn't know about all the

> witnesses that [testified]. You, ladies and gentlemen, know more about this case than he did when he wrote his report . . . . You know everything. You know all the witnesses who said she was not suicidal, that she didn't do this. And so you can confidently find this individual guilty.

¶86　The prosecutor's statement that the medical examiner "didn't know about all the DNA work" is an accurate characterization of the evidence. The medical examiner testified that he did not have all of Uta's medical records, all of the police reports or witness statements, the crime scene reconstructionist's report, the bloodstain expert reports, or "any of the DNA reports that had been done." Moreover, the prosecutor's statement did not suggest, as Wall claims, that the DNA evidence alone conclusively established that Uta had been murdered. Instead, the prosecutor pointed to "everything" the jury heard during the trial that the medical examiner did not know, including not just the DNA evidence, but also information about Uta's medical and mental health records and the testimony of numerous witnesses offered during the four-week trial. In context, the prosecutor's argument neither misstated the evidence nor overemphasized the importance of the admittedly inconclusive DNA evidence. As a result, any objection made by trial counsel to this statement would have been futile and did not constitute deficient performance. *See State v. Perez-Avila*, 2006 UT App 71, ¶ 7, 131 P.3d 864 ("It is well settled that counsel's performance at trial is not deficient if counsel refrains from making futile objections, motions, or requests.").

¶87　Wall also argues that trial counsel should have objected to the prosecutor's statements about DNA found on Uta's comforter. One of the forensic laboratory's analysts testified that the laboratory collected DNA using different methods on five areas of Uta's comforter and submitted them for testing. Four of the test results either excluded Wall or were inconclusive for male DNA. The fifth test included Wall as possible contributor. The analyst also conceded on cross-examination that, based on

the results of the test, all four children's alleles are accounted for [and Wall's] alleles are accounted for" in that sample. Wall contends that the prosecutor erroneously "insisted the DNA must be from [Wall] rather than the Wall children" because the State mischaracterized how the DNA samples were collected from the comforter when it said that the DNA came from "pinpoint location[s]."

¶88 As an initial matter, we note that trial counsel moved to exclude all of the DNA evidence prior to trial based on "inaccurate statistical evidence for DNA mixtures" but later withdrew that motion with respect to the DNA collected from Uta's comforter. Trial counsel chose instead to advance the theory at trial—through the defense's own expert testimony and through cross-examination of the State's experts—that there was a "possibility of all of the children being [contributors]" to some of the DNA samples, including the comforter, and therefore "it's impossible to determine if [Wall's] DNA is in that sample." Trial counsel reiterated this point in closing argument:

> Now [the State] is probably going to talk to you about if [Wall's] and [Uta's] allele charts are both present, if their genetic patterns are both there, then all the kids are going to be there too. Use your common sense. You have four kids living in the house and [Uta] living in the house . . . . Whose DNA is going to be on the comforter? The people living in the house.
>
> . . . .
>
> And if you remember the hypothetical that I gave to [the State's expert] that if all the children used the towel when they'd been out hiking or sweating and had DNA placed in the towel . . . to a sufficient degree that it could be tested, that even if [Wall] was in Australia, . . . he would be found to be a possible contributor.

¶89    In the State's rebuttal closing argument, the prosecutor reminded the jury that the two eldest children testified they had "never been on [Uta's] bed for a long time . . . [s]o their DNA won't be there." He also said that the DNA was not "all over the comforter" and was instead at "a very pinpoint location." He further explained:

> That's where you are going to find [Wall's] DNA. And it's not going to be because the children were there, because you need to have all four children to be on that same spot. And you're going to tell me that at these particular locations all four children went and equally touched that spot to make that combination? That's ridiculous. The more likely and the real reasonable [explanation] is that one person touched it, and it's [Wall].

¶90    It is unclear why trial counsel would be deficient for failing to object to the very argument that he forecasted for the jury in his own closing argument. Trial counsel had already presented a counterargument to the State's theory by providing the jury an alternative explanation for why certain DNA samples could have included Wall's DNA without Wall having ever touched the relevant items. And trial counsel reiterated at many points throughout trial and in closing argument that the DNA evidence was "meaningless" because Wall was excluded as a possible contributor to some of the DNA samples and that he should have been excluded as a possible contributor to other DNA samples because the laboratory's methods were "unreliable." Trial counsel's strategy related to this DNA evidence was clear, and his strategic decision not to object to the State's alternative characterization of this same evidence was not deficient.

¶91    Further, any objection to the prosecutor's statement would have been futile. *See Perez-Avila*, 2006 UT App 71, ¶ 7. Just as trial counsel was free to argue that it was more reasonable that the children's DNA had combined on the comforter to

create a sample that happened to be consistent with Wall's DNA, the State was free to argue that it was more likely that a single person, Wall, was the contributor. *See Houston*, 2015 UT 40, ¶ 76 (recognizing that "counsel for both sides have considerable latitude in their closing arguments," that "they have the right to fully discuss from their perspectives the evidence and all inferences and deductions it supports," and that the State has "the duty and right to argue the case based on the total picture shown by the evidence" (cleaned up)).

¶92 Relatedly, Wall has not persuaded us that trial counsel was deficient in failing to object to the prosecutor's statement that the DNA was extracted at a "pinpoint location" and that all of the children would have had to touch that exact spot. The State's expert testified that the DNA was collected via M-Vac only on the locations where there were bloodstains. Thus, the samples were not drawn from the entire comforter, as Wall suggests. And trial counsel could have reasonably determined that objecting would have been futile and would have drawn greater attention to that evidence. *See Perez-Avila*, 2006 UT App 71, ¶ 7; *see also State v. Ott*, 2010 UT 1, ¶ 39, 247 P.3d 344 (noting "that avoidance of drawing the jury's attention to certain facts or over-emphasizing aspects of the facts is a well recognized trial strategy").

¶93 "The object of an ineffectiveness claim is not to grade counsel's performance." *Strickland v. Washington*, 466 U.S. 668, 697 (1984). Instead, we "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. In this case, Wall has not shown "that the challenged actions cannot be considered sound strategy under the circumstances." *See State v. Torres*, 2018 UT App 113, ¶ 16, 427 P.3d 550 (cleaned up).

CONCLUSION

¶94 We conclude that there was sufficient evidence to support Wall's murder conviction. We further conclude that the district

court did not exceed its discretion in admitting certain DNA evidence because the State made the threshold showing that the forensic laboratory's methods and policies were reliable. Finally, Wall has not persuaded us that his trial counsel performed deficiently in failing to object to certain parts of the State's closing arguments because the State did not mischaracterize the evidence and the arguments fairly responded to the theories argued by the defense.

¶95    Affirmed.

———————